[Civ. No. 14885. Second Dist., Div. Three. Aug. 31, 1945.]

RICHARD R. HARLAN, Respondent, v. MERICIA G. HARLAN, Appellant.

August J. O'Connor and George J. Hider for Appellant.

Button, Herzog & Butts for Respondent.

FOX, J. pro tem.—Plaintiff brought this action to have his ceremonial marriage to defendant annulled on the ground that at the time of said ceremony defendant had a former husband living, and that her marriage to said former husband had not been dissolved by divorce or otherwise.

Defendant is a native of Cuba. In December, 1921, she married, in Havana, Karl Hugo Karlsson, a national of Sweden. In 1927, plaintiff was in Havana making some motion pictures. He met defendant, a housewife, and employed her for a brief period in making two pictures. When plaintiff and his party returned to California later on that year, defendant came with them on the same boat. Defendant testified that plaintiff promised her work in certain pictures he had under contract to make if she would come along. Sometime after arriving in California plaintiff and defendant began living together as man and wife. In 1929 defendant went back to Havana and, at the request of the plaintiff, discussed with her husband the matter of her getting a divorce. He consented. Soon after her return to California plaintiff, with whom she continued to live, took her to a Mexican attorney in Los Angeles and made arrangements with him to secure a Mexican divorce for defendant. She did not then speak or understand English, and testified at the trial herein through an interpreter. The part that plaintiff had in arranging for this divorce is best shown by the deposition of the attorney

who was employed to procure this divorce. The following interrogatories and answers are pertinent on this point: ''[Q.] Did Richard Harlan and Mericia G. Harlan engage your services to secure a Mexican divorce for Mericia G. Harlan from her then husband, Karl Hugo Karlsson? A. Yes, that's right. [Q.] Did Mr. Richard Harlan ask you about securing this divorce for Paulina Mericia Gonzales Karlsson? A. Yes, that's right. [Q.] Please state what you recall Richard Harlan said regarding that matter at that time. A. Mr. Richard Harlan expressed to this deponent that he desired to obtain a divorce for Paulina Mericia Gonzales Karlsson, with whom he wanted to get married after the divorce. . . . [Q.] After you secured the decree of divorce, did you inform Mr. Richard Harlan and Paulina Mericia Gonzales Karlsson of that fact? A. Yes, I informed them. [Q.] Thereafter, did you receive any monies from Richard Harlan for your fee? And if so, how much, if you recall? A. Yes, I received the money from Mr. Harlan, and I assume it was in the neighborhood of $300. [Q.] Did Richard Harlan pay you anything for your services in connection with this divorce? A. Mr. Harlan from its beginning undertook to pay the costs of this divorce, and he paid them. [Q.] Did Richard Harlan tell you at any time that he wanted you to secure this foreign divorce so that he could marry Paulina Mericia Gonzales Karlsson? A. Yes, that is true, as I have expressed hereinabove. . . . [Q.] Please relate the conversation which you claim took place between you and Mrs. Karlsson and Mr. Harlan at your first interview, stating in substance what each person said. A. The conversation that took place in the first interview consisted in the fact that the persons who came expressed to deponent that they desired a Mexican divorce. They asked for details regarding price, time of duration, validity of the same; and Mr. Harlan expressed the desire that he wanted this divorce rapidly because he desired to marry Mrs. Karlsson. [Q.] Isn't it true that Mr. Harlan was simply introduced as a friend of Mrs. Karlsson and that he took no active part in engaging you? A. Mr. Harlan took active part in the matter, because it was he who undertook to pay for the matter I have expressed in my answer hereinabove. . . . [Q.] On how many occasions, if any, did you contend Mr. Harlan accompanied Mrs. Karlsson at such conferences? A. I cannot fix the occasions when Mr. Harlan accompanied Mrs. Karlsson to the

office of the deponent, but I do remember that besides the first time on the conference when he was in my office, Mr. Harlan telephoned me inquiring regarding the decree, the final decree. [Q.] Did you ever confer with Mr. Harlan alone? A. I don't remember if Mr. Harlan was alone in my office or in the office of the deponent, but I do remember that he called me over the telephone a number of times. . . . [Q.] Do you know of your own knowledge who owned the funds with which you were paid? A. Deponent does not know who was the owner of the funds, but I repeat that Mr. Harlan was the one who undertook to pay them.'' This lawyer also testified that he advised the parties that they would be free to marry when the Mexican decree was granted. Pursuant to the foregoing arrangements an action for divorce from Karl Hugo Karlsson was filed on behalf of the defendant herein in the State of Sinaloa, Republic of Mexico, in the summer of 1930. Neither of the parties established any domicile or residence in the State of Sinaloa or were physically present therein during the pendency of said action. The entire matter was handled by the respective attorneys of the parties through authority given by powers of attorney. Mr. Karlsson filed, through his attorney, his consent that the divorce be granted to his wife, and such decree was granted to her in December, 1930. Plaintiff and defendant went through a marriage ceremony in Los Angeles, California, on March 11, 1931, and lived together as husband and wife until December, 1943, when they separated. Mr. Karlsson died in 1942.

■ The Mexican divorce granted to the defendant herein from Mr. Karlsson was of the ''mail order'' class. The decree, however, did not affirmatively show upon its face that neither of the parties had resided there. Upon this fact being shown the invalidity of the decree in this state was thereby established, since the court in Mexico did not have jurisdiction of either of the parties or of the subject matter of the action. (*Ryder* v. *Ryder* (1934), 2 Cal.App.2d 426 [37 P.2d 1069]; *People* v. *Harlow* (1935), 9 Cal.App.2d 643 [50 P.2d 1052]; *Kegley* v. *Kegley* (1936), 16 Cal.App.2d 216 [60 P.2d 482]; *Estate of McNutt* (1940), 36 Cal.App.2d 542 [98 P.2d 253].) ■ The consent of Mr. Karlsson could not confer jurisdiction to grant his wife, the defendant herein, a decree of divorce. (*Ryder* v. *Ryder, supra; Kegley* v. *Kegley, supra; Andrews* v. *Andrews* (1903), 188 U.S. 14 [23 S.Ct. 237, 47

L.Ed 366].) Nor is this decree entitled to recognition by the courts of California under the provisions of section 1915, Code of Civil Procedure, for "this section expressly limits its application to final judgments of courts having jurisdiction. And by section 1917 of the Code of Civil Procedure, such jurisdiction must be 'over the cause, over the parties, and over the thing, when a specific thing is the subject of the judgment.' " (*People* v. *Harlow, supra,* at p..646.) And, as pointed out in *Ryder* v. *Ryder, supra,* at page 431, no assistance is afforded by section 1915, Code of Civil Procedure, "because of the lack of the very elements specified" by that section. In the instant case, as in the Ryder case, "There is nothing in the record to indicate what the law of Mexico is concerning divorce. We have been directed to no statute or code or other law of that country governing the subject of divorce. If, however, it be assumed that the laws of that country require no residence nor the presence of the parties within its territory as a basis of jurisdiction, and that the formal requirements established by Mexican law were met, then the divorce cannot be recognized under the laws of this state" (p. 432).

 Plaintiff, however, is not in a position to take advantage of the invalidity of the Mexican divorce decree which the defendant obtained from Mr. Karlsson. The record is clear that plaintiff paid the attorney's fee and expenses for obtaining said divorce and that he had an active and dominant part in arranging for same and in seeing that it was carried through expeditiously. Plaintiff herein was not technically a party to the Mexican suit. But he certainly was interested in its outcome. He was anxious that defendant be in a position so that he could marry her. He would thereby extricate himself from the immoral and illegal relationship in which he had been living. He as much as any other, not excepting the defendant, was responsible for institution of the suit and obtaining the decree. His interest then was to procure the result which he now seeks to nullify, after having lived with defendant as husband and wife for over twelve years. That the sweet may have turned sour does not make it conscionable that the plaintiff should be allowed now to undo what his own hand and mind had so much to do in creating. Plaintiff is therefore not in a position to question the validity of defendant's divorce. This is on the principle of quasi estoppel "which is based

upon the principle that one cannot blow both hot and cold, or that one 'with full knowledge of the facts shall not be permitted to act in a manner inconsistent with his former position or conduct to the injury of another.' (10 Cal.Jur., p. 645; *McDanels* v. *General Ins. Co.,* 1 Cal.App.2d 454, 459 (35 P.2d 394), [36 P.2d 829].) Another way of stating the same general principle (applicable directly to the instant case) is that one who has invoked the exercise of a jurisdiction within the general powers of the court cannot seek to reverse its orders upon the ground of lack of jurisdiction. 'The principle opposing such action is one of estoppel in the interest of a sound administration of the laws whereby the regularity or even validity of an act procured by one himself cannot be raised—not that the act is valid, for it may not be, and estoppel does not make valid the thing complained of, but merely closes the mouth of the complainant. (*Spence* v. *State Nat. Bank,* (Tex.Com.App.) 5 S.W.2d 754.) The principle is known as the doctrine of acquiescence often referred to as quasi estoppel.' '' (*Estate of Davis* (1940), 38 Cal. App.2d .579, 584-5 [101 P.2d 761, 102 P.2d 545].) In the Davis case the deceased urged respondent to go to Nevada, establish a residence for the sole purpose of securing a divorce, and then to marry him. He paid the costs and expenses of the divorce, and went to Reno and took an active part in the preparation of the case, and married respondent on the day the divorce was granted. Upon the death of Mr. Davis his heir attacked the validity of respondent's divorce and subsequent marriage to Mr. Davis. .The court held that because of Mr. Davis' part in procuring the Nevada decree for respondent he would have been foreclosed from denying the validity thereof or the subsequent marriage under the doctrine of quasi estoppel and that his heir was in no better position.

In *Goodloe* v. *Hawk* (1940), 113 F.2d 753, the plaintiff husband sought an annulment of his marriage with defendant on the ground that her Virginia divorce was not valid. He claimed that she was never either domiciled in or a bona fide resident of Virginia. It appeared, however, that the plaintiff had asked her to get a divorce so that he could marry her and that he had paid for the divorce. After they had lived together more than a decade plaintiff brought an action for annulment in the District of Columbia. The United States Court of Appeals, in an opinion by Mr. Justice Fred M. Vin-

son, held that the husband "should be barred by the salutary principles of laches or estoppel from challenging the Virginia court's finding" that the defendant wife was domiciled there.

In *Saul* v. *Saul* (1941), 122 F.2d 64, in an opinion written by Mr. Justice Rutledge (now of the United States Supreme Court) the principle of estoppel was applied to prevent the plaintiff husband in an annulment action from questioning the sufficiency of the notice that was given in the defendant's prior divorce action to her then husband, Mr. Gardner. This was upon the basis that he had ·financed the divorce and actively aided her in procuring it.

In *Margulies* v. *Margulies* (1931), 109 N.J.Eq. 391 [157 A. 676], it is said in the syllabus by the court that "One who induces a defendant to obtain a foreign divorce and pays the expenses thereof, and afterwards marries her, is precluded from attacking the validity of the divorce."

In *Van Slyke* v. *Van Slyke* (1915), 186 Mich. 324 [152 N.W. 921], the plaintiff wife sued defendant for a divorce. He sought to show that she had procured her divorce from a former husband through misrepresentation of her residence and that therefore said decree was not valid and consequently their marriage was invalid. The court pointed out that he was "quite as much interested in procuring the decree of divorce as was the complainant, proposed to pay her counsel and advised her and her counsel of his interest. He intended to profit by the decree of divorce, not in a financial way, but in removing an obstacle to his marriage with complainant." The court held that by reason of these circumstances he had no standing to present such a defense. (See, also, *Bowen* v. *Finke* (1940), 34 F.Supp. 235.)

That the defendant was imposed upon by the plaintiff is clear. After discussing the evidence at great length at the close of the trial, the learned trial judge at the very conclusion of his summation of the case said: "I think here the defendant is the innocent party. No question about it in my mind. The plaintiff is not innocent." Under such circumstances and in view of the evidence and authorities the defense of quasi estoppel should have been sustained. To hold otherwise protects neither the welfare nor morals of society but, on the contrary, such holding is a flagrant invitation to others to attempt to circumvent the law, cohabit in unlawful

state, and when tired of such situation, apply to the courts for a release from the indicia of the marriage status.

Respondent relies on *Sullivan* v. *Sullivan* (1934), 219 Cal. 734 [28 P.2d 914]. That case has no application here because the plaintiff there only had an "interlocutory" decree when she remarried. She was not divorced.

The judgment is reversed with directions to retry only the issues made by the amended cross-complaint for divorce and the answer thereto.

Shinn, Acting P. J., and Wood (Parker), J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied October 29, 1945.