[Civ. No. 993.    Fifth Dist.    June 19, 1969.]

REGINA JOSEPHINE BROWN, Plaintiff and Respondent, v. RALPH WALDO BROWN et al., Defendants and Appellants.

Frederick L. Hilger for Defendants and Appellants.

C. Ray Robinson, William T. Ivey, Jr., John Bucan, Peter Morris and John E. Whiting for Plaintiff and Respondent.

GARGANO, J.—Ralph Waldo Brown (hereafter referred to as Ralph) and Regina Josephine Brown (hereafter referred to as Regina) were married in 1916. The marriage commenced to deteriorate in 1932 when they ceased living together except for occasional weekend visits by Ralph. Regina brought this action for a divorce in 1966, almost 35 years later. She named Charlotte Lundblade (hereafter referred to as Charlotte), who has lived with Ralph, as Ralph's wife, since 1939, as co-defendant. Ralph and Charlotte appeal from the judgment granting Regina an interlocutory decree of divorce on the ground of extreme cruelty and awarding Regina approximately one-fourth of all the property standing in Ralph's and Charlotte's joint names and one-fourth of most of the property standing in Charlotte's own name, together with alimony in the amount of $400 per month and attorney fees and costs. In short, the trial court found that Ralph was validly married to Regina, that his 1939 ex parte Mexican divorce from Regina was invalid, that his 1939 marriage to Charlotte was also invalid, that Charlotte was not Ralph's putative spouse but, rather, had lived with him for more than 28 years after their invalid marriage in a meretricious relationship, that Ralph and Charlottle so commingled their individual properties that the separate interests could not be traced, that one-half of all property standing in Ralph's and Charlotte's joint names and one-half of all property (with a few minor exceptions) standing in Charlotte's name alone was the community property of Ralph and Regina, that Regina was entitled to one-half of the community property, or about $600,000, plus attorney fees and costs in the amount of $78,802.01.

It is conceded that Ralph acquired a Mexican divorce from Regina in 1939 without giving her notice. Thus, it is also clear that the court's findings that Ralph's divorce was void and that his subsequent marriage to Charlotte in 1939 was invalid are supported by the evidence and the law. The California courts have long denied validity to Mexican divorces obtained by California residents "ex parte without reasonable notice." (*Scott* v. *Scott,* 51 Cal.2d 249, 256 [331 P.2d 641] [concurring].) Moreover, once a divorce is proved invalid, a subsequent marriage by either party is also deemed invalid (*Estate of Goldberg,* 203 Cal.App.2d 402 [21 Cal.Rptr. 626]). Nevertheless, this case is a classic example of the basic unfairness of an archaic rule, which purports to allow a wife, who stood silently and complacently by, collecting support payments for

almost 28 years with the knowledge that her husband was openly and notoriously living with her rival in a marital relationship, to step in and successfully claim almost $600,000 of property accumulated by the husband and his new partner, partly through their combined efforts and partly through the use of the other woman's separate property. And, significantly, this archaic rule was applied in this case merely because the wife did not have "any substantial or convincing knowledge" that the husband had procured an invalid Mexican divorce. The facts leading to this bizarre result are these:

Ralph and Regina were married in Tehama County, California in 1916. Three children were born to the marriage, in 1917, 1920 and 1927, respectively. Ralph was a civil engineer engaged in construction work, and from 1917 to 1930 the family moved from one construction job to another; they then settled in Oroville in 1930.

Two years later, in 1932, Regina received an anonymous letter from Eureka, stating that Ralph was keeping company with "a very respectful young woman of this town and posing as an unmarried man." She hired a private detective and learned that her husband was having an affair with Charlotte. Regina then confronted Charlotte in Eureka and asked her if she was "going around with her husband." Charlotte admitted that she was keeping company with Ralph; she stated that he told her that he "had been married but had a divorce in the making." The two women agreed to confront Ralph in Sacramento.

On the following day the parties to the triangle met in a hotel room in Sacramento. Charlotte testified that Ralph told Regina that he wanted her to obtain a divorce and that if she refused he would obtain the divorce himself. Charlotte also testified that she told Ralph and Regina that if they were not going to get a divorce, and could make up and live happily together, she would never see Ralph again. Regina denied that Ralph asked her for a divorce and that Charlotte offered to give Ralph up. However, a short time later she wrote Ralph "when you told me in Sacramento that you would never live with me again, did you think for one minute I would try to make you?"

Following the confrontation in the hotel in Sacramento, Ralph continued his meretricious relationship with Charlotte until 1939. In 1939 he informed her that he acquired a final decree of divorce. He also asked her to marry him. Charlotte consented, and the marriage ceremony was performed in

Azusa, California on March 25, 1939. At the time, Ralph had no assets of his own; he was a salaried employee of a construction firm earning about $300 a month. On the other hand, Charlotte owned a summer home at Orick, a home on Porter Street in Eureka, a bowling alley in downtown Eureka, an apartment house with four rental units in Eureka, and an undivided one-eighth interest in ranch property on the Eel River.

In November 1940 Charlotte purchased a construction company with her own money and in her own name.[1] She then transferred most of her separate property to the company to insure adequate capitalization.[2] A few months later the company was reincorporated as the Mercer, Fraser Corporation, and a single stock certificate, representing 100 percent ownership, was issued to Charlotte. Thereafter, the new corporation engaged in the contracting business with Ralph as its general manager until October 1942.

In October 1942 Ralph and Charlotte formed a limited partnership. Ralph was designated a general partner and given a salary of $500 per month. He was also given one-half of the partnership profits. On the other hand, Charlotte was designated as a limited partner and was to receive the remaining one-half of the partnership profits. Charlotte then dissolved the Mercer, Fraser Corporation and transferred its assets actually used in the contracting business to the limited partnership. Charlotte's separate properties are reflected on the corporation balance sheet as being transferred back to and retained by her as her separate property.[3]

Two years later, in 1944, Ralph adopted Charlotte's daughter, Beverley, and when Beverley died (in 1960) he and Charlotte adopted Beverley's three children.

---

[1] The terms of the sale were $7,500 cash down and a balance of $10,500 payable in installments of not less than $250 per month plus 5 percent per annum upon the deferred balance. Real property owned by the seller corporation was to be purchased within three years for $12,000.

[2] Charlotte transferred the following properties: ''The summer home at Orick, her apartment building in Eureka, the bowling alley in downtown Eureka, the ⅛ interest in the Eel River Ranch, and the home which she had recently acquired in Eureka, apparently from the sale of her old Porter Street home. However, the deeds in which these properties were conveyed to the new company were not recorded.

[3] There were no deeds back from the corporation to Charlotte, apparently because the initial deeds from Charlotte to the corporation had not been recorded. Also, the closing balance sheet of the Mercer, Fraser Corporation shows a balance due Ralph of some $53,000. It is not clear from the record how Ralph acquired this interest. However, Charlotte testified

In 1948 Ralph and Charlotte formed a corporation and again named it the Mercer, Fraser Corporation. They also transferred all of the limited partnership assets to the new corporation. Ralph became the president and general manager and held this position until 1963. In 1963 Ralph became very ill from Parkinson's disease. He visited the Mayo Clinic in Rochester, Minnesota for treatment, but his condition deteriorated rapidly. Ralph was never again in full active charge of the business.

In 1962 the Mercer, Fraser Corporation encountered severe financial difficulties. In November of that year the company borrowed $300,000 from the Small Business Administration, and after applying this loan to the payment of its debts still owed about $600,000. The following year the company was in serious financial difficulty and borrowed an additional $100,000 from the bank. Charlotte personally guaranteed the Small Business Administration loan and even pledged her downtown Eureka commercial property to guarantee the corporation's credit. She also loaned the company $20,000 and $50,000 from funds standing in her own name. The company's financial picture changed after 1963, and by July 31, 1966, it showed a net worth of approximately $1,000,000.

Returning to Regina, we find that in 1933 she moved, with Ralph's mother (who by then was living with her) and the children to Oakland so that the oldest son, John, could enroll at St. Mary's College. Ralph visited the family on weekends and holidays. He also sent Regina $200 a month. Ralph's visits were discontinued in 1939, and by 1940 almost all correspondence stopped. However, the monthly payments continued (with the exception of one short interval) until June 1966. Moreover, Ralph sent $30 a month to his oldest son John to help him with his schooling, and he also paid the tuition for his daughter for a master's degree at Stanford.

In 1941 Regina moved to a home in Albany, which was purchased by "Ralph W. Brown and Regina J. Brown, his wife, as joint tenants."[4] The children lived with Regina in

---

that at Christmas in 1941 she gave Ralph one-half of the stock in the corporation as a Christmas gift. She said that a Eureka attorney, Mr. Woodman, drafted a document purporting to legalize the gift. No copy of this legal document has ever been found, and Mr. Woodman has been dead for many years.

[4]Ralph and Regina executed a deed of trust against the house to secure a note in the amount of $3,500. Two and one-half years later, on August 26, 1943, Ralph executed a deed conveying his interest in the house to Regina.

this home until the youngest was old enough to leave in 1944. Ralph's mother also lived with Regina in the home until her death in 1947. After her mother-in-law's death, Regina continued to live in the Albany home by herself until 1965 when she moved to Livingston, California to be with her daughter Betty. In the meantime she worked for several years and even took a trip to Europe.

In June 1966 Regina received a $200 check from Charlotte with a notation stating that it was the last check Regina was going to receive. Then Regina applied for Medicare and learned that she was eligible for Social Security payments. The Social Security Administration contacted Charlotte about Ralph and Regina's marital status and discovered that Ralph had acquired a Mexican divorce. When Regina learned of the invalid divorce, she contacted a lawyer and this litigation followed.

At the trial Charlotte denied that she had any knowledge or suspicion that Ralph obtained a divorce in Mexico when she married him in 1939. She said that Ralph was a close mouthed individual and seldom discussed his affairs. She testified that he told her that he had procured a divorce, that she believed him and that she never questioned him or asked to see the papers until she was contacted by the Social Security Administration in 1966. Charlotte related that she discovered that Ralph had acquired the Mexican divorce when she found the decree in a box of old documents after following his directions.

Appellants' well considered brief contains numerous contentions for reversal of the judgment. However, before directing our attention to their crucial contentions, we are constrained to observe, from the very outset, that our own independent review of the voluminous record leads us to believe that the trial judge was unduly swayed by the eloquence of respondent's lawyer. For example, he declared that Ralph and Charlotte had so commingled their individual properties that their separate interests could not be traced. Thus, he apparently declined to trace to Charlotte all of the separate property she owned when she married Ralph, which not only had substantially increased in value but which, from our view of the evidence, was readily traceable. Moreover, he seemingly ignored the fact that most of the money that Ralph and Charlotte earned during the 28 years of their invalid marriage was earned from a construction business purchased by Charlotte in 1941 with her own money, and then given

financial stability with her own separate assets. He also seemingly ignored Charlotte's uncontradicted testimony, amply supported by the evidence, that she made a gift of one-half of this business to Ralph.

For a further example, the judge awarded Regina approximately $600,000 worth of property and then ordered Ralph, who was an extremely ill man, to pay all community property debts (including his own attorney fees), alimony in the amount of $400 per month, and Regina's attorney fees and costs (amounting to $78,802.01) out of his one-half share. Thus, the trial judge awarded Regina substantially more than one-half of the so-called community property which Ralph accumulated over a 28-year period without her assistance.

As further evidence that the judge was unduly swayed, he found that Charlotte was not Ralph's putative spouse, albeit the uncontradicted evidence and all rational inferences which can be drawn therefrom lead to the inescapable conclusion that she was in good faith when she married him in 1939. Stated in a slightly different manner, good faith is the essential ingredient to a putative marriage, and when the trial judge found that Charlotte did not act in good faith when she married Ralph, he did so contrary to the rule that it is presumed that persons who participate in marriage ceremonies do so in good faith and that "he who would assert 'bad faith' should be able to point to some evidence proving or tending to prove" it. (*Krizman* v. *Industrial Acc. Com.*, 14 Cal.App.2d 419, 422 [58 P.2d 405]; *Brennfleck* v. *Workmen's Comp. App. Bd.*, 265 Cal.App.2d 738 [71 Cal. Rptr. 525].) Charlotte testified that when Ralph asked her to marry him in 1939, he informed her that he had received his final decree of divorce. This uncontradicted testimony is not inherently improbable and is not impeached by other evidence. On the contrary, the testimony is corroborated by convincing circumstantial evidence. Significantly, Charlotte engaged in a meretricious relationship with Ralph for almost seven years after she learned that he was married. However, she did not marry Ralph nor did she live with him as his wife until he told her he had secured a divorce. Moreover, before the invalid marriage, Charlotte managed her own substantial property interests without Ralph's help and maintained a separate home in Eureka with her daughter Beverley. After the marriage she established a home with Ralph in Eureka, allowed him to adopt her daughter, purchased a construction business with her own money and then

either gave or allowed Ralph to acquire a half interest in this valuable business. ██ As the California Supreme Court succinctly stated in *Gomez* v. *Cecena*, 15 Cal.2d 363, 366 [101 P.2d 477] : "While no universal and immutable formula can be prescribed for determining the weight to be accorded testimonial evidence, it has frequently been said that testimony which is not inherently improbable and is not impeached or contradicted by other evidence should be accepted as true by the trier of fact."

██ In rebuttal Regina points to Charlotte's testimony that she would not have married Ralph had she known that he obtained a divorce in Mexico. She argues that this testimony is substantial evidence to support the court's implied finding of "bad faith" because it can be inferred that Charlotte knew of the invalidity of Mexican divorces. However Charlotte's admission is a two-edged sword; it supports the inference that when she married Ralph she knew that ex parte Mexican divorces are invalid. On the other hand, it cuts against any inference that she knew where Ralph had obtained his divorce.

Regina argues that Charlotte cohabited with Ralph long before their marriage and that this shows a lack of good faith belief in the validity of their marriage. Charlotte admitted visiting Ralph on several occasions at various places where he was working around the state, and to registering with him in various hotels and motels on these visits. She also admitted living in Ralph's apartment for several weeks on one of those visits. However, we reiterate the self-evident fact that Charlotte's involvement in a meretricious relationship with Ralph for almost seven years before she married him, corroborates her claim that she believed him when he told her he was divorced.

Regina asserts that Charlotte schemed, coerced and cajoled Ralph for seven years before she could overcome his strong reluctance to divorce Regina. She concludes that having finally obtained her goal, Charlotte must have feasted her eyes upon the divorce papers which constituted a symbolic representation of her victory. However, this argument is not based on substantial evidence; it is mere conjecture and nothing more. Morever, while it is true that Charlotte admitted that she insisted that Ralph obtain a divorce or she would break off their relationship, it is also clear that Ralph wanted a divorce from the very beginning and that his long delay in obtaining one was due to the transient nature of his employment.

Regina alleges that in 1961 Charlotte began pumping funds

held jointly by her and Ralph into her separate bank accounts. She maintains that this evidence supports the inference that Charlotte knew of the invalidity of Ralph's divorce and was afraid that Regina too would discover its invalidity after she wrote to Ralph in 1960, requesting his divorce papers. However, even if it is true that Charlotte began "pumping" joint funds into her separate accounts in 1961, it does not support the inference that she knew of the invalidity of Ralph's divorce 20 years earlier. If anything, it raises an inference that she learned of the Mexican divorce decree in 1960 after she was alerted by Regina's letter.

■ With this view of the evidence firmly in mind, we turn to appellants' main contentions for reversal of the judgment. Briefly, they assert that Regina's cause of action for a divorce on the ground of extreme cruelty is barred by the statute of limitations because the more than 34 years which elapsed between the separation in 1932 and the filing of the divorce complaint in 1966 is an "unreasonable lapse of time" as a matter of law (Civ. Code, § 124). They also assert that Regina is estopped from challenging the validity of Ralph's Mexican divorce and argue that the denial of a divorce to Regina on this ground will subserve the public policy of this state as articulated in *Rediker* v. *Rediker,* 35 Cal.2d 796 [221 P.2d 1, 20 A.L.R.2d 1152], because it has the effect of severing the marriage between Ralph and Regina (which is what Regina wants) without injuring the innocent third party, Charlotte. We shall deal first with estoppel.

The doctrine of equitable estoppel is "pre-eminently" the creature of equity and "[i]ts foundation is justice and good conscience." (3 Pomeroy, Equity Jurisprudence, § 802, p. 180.) It has been defined by Professor Pomeroy as ". . . the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, or contract, or of remedy." (3 Pomeroy, Equity Jurisprudence, § 804, p. 189.) ■ In short, it is the object of equitable estoppel to prevent a person from asserting a right which has come into existence by contract, statute or other rule of law where, because of his conduct, silence or omission, it would be unconscionable to allow him to do so.

This salutary doctrine under the nomenclature "quasi estoppel" was initially drawn upon by the courts of this state to foreclose parties who procured, or aided in the procurement of, invalid divorce decrees from attacking a subsequent good faith marriage, and more particularly from unconscionably claiming community property rights in property acquired by the other marital partner after the invalid divorce was procured (*Spellens* v. *Spellens,* 49 Cal.2d 210 [317 P.2d 613]; *Harlan* v. *Harlan,* 70 Cal.App.2d 657 [161 P.2d 490]; *Estate of Davis,* 38 Cal.App.2d 579 [101 P.2d 761, 102 P.2d 545]). Later, however, the equitable defense was also upheld against a husband who did not actually assist his wife to procure a Mexican decree but who knew that she had acquired a divorce in Mexico and did nothing to ascertain its validity (*Estate of Shank,* 154 Cal.App.2d 808 [316 P.2d 710). In an enlightened opinion Justice Stone, speaking for a unanimous court, stated at page 811: "However, no particular set of facts is necessary to invoke an equitable estoppel if the facts come within the principle enunciated in *Estate of Davis,* 38 Cal.App.2d 579, 584 [101 P.2d 761, 102 P.2d 545], where the court says:

" ' . . . our courts have recognized another species of estoppel, called "*quasi* estoppel," which is based upon the principle that one cannot blow both hot and cold, or that one "with full knowledge of the facts shall not be permitted to act in a manner inconsistent with his former position or conduct to the injury of another." (10 Cal.Jur., p. 645; *McDaniels* v. *General Ins. Co.,* 1 Cal.App.2d 454, 459 [35 P.2d 394, 36 P.2d 829]. . . .'

"Here, Worley was personally served with a copy of the summons and complaint for divorce. He did nothing to ascertain their validity nor to attack the decree even though he knew that it had been secured in Mexico. Rather, he continued to live separate and apart from decedent, he made no effort to contact her, and he did not support her but let her purported second husband, Shank, assume that obligation. Worley took title to real property in his name alone and had himself designated on the deed as 'a single man.' It is true as Worley says, he did not remarry, but he did establish a relationship with a housekeeper whom he paid $25 a week while she lived in his home. The trial court concluded the relationship was of a meretricious nature. We believe the facts in this case bring it within the rationale of *Estate of Davis,* 38 Cal.App.2d 579 [101 P.2d 761, 102 P.2d 545]; *Hensgen* v. *Silberman,* 87 Cal.

App.2d 668 [197 P.2d 356]; *Rediker* v. *Rediker*, 35 Cal.2d 796 [221 P.2d 1, 20 A.L.R.2d 1152]; *Estate of Coleman*, 132 Cal. App.2d 137 [281 P.2d 567]; and cases cited in those opinions.''

We conclude that this case contains all the ingredients of an equitable estoppel mentioned by Professor Pomeroy in his treatise on Equity Jurisprudence. Moreover, it falls within the ambit of *Estate of Shank*, 154 Cal.App.2d 808 [316 P.2d 710]. In fact, in our judgment, this case is a classic example of a wife who slept on her property rights year in and year out and who, by her silence and acquiescence, allowed the rights of a third party to intervene. Thus, she must bear the consequences of her own omission. As the court aptly stated in *Union Bank & Trust Co.* v. *Gordon*, 116 Cal.App.2d 681, 684 [254 P.2d 644] : ''It is axiomatic that one who is silent when he ought to speak cannot speak when he ought to be silent.''

Our reasons are these: It is absolutely clear from the evidence that when Ralph married Charlotte in 1939 he had no property of his own. It is also absolutely clear from the evidence that the property which Ralph and Charlotte acquired during the more than 28 years of their invalid marriage was acquired partly through their combined efforts and partly through the use of Charlotte's separate property. In fact, as we have mentioned, Ralph and Charlotte made most of their money from a construction business that was purchased by Charlotte with her own money, given financial stability through the use of Charlotte's separate assets, and saved from possible bankruptcy in 1963 when Ralph was seriously ill, by loans guaranteed by the pledging of property standing in Charlotte's own name. Moreover, Regina knew that Ralph and Charlotte were living together as husband and wife and were accumulating property. In fact, she visited her son John, who was employed by his father in the construction business, on numerous occasions in Eureka, and knew that Ralph and Charlotte were operating a successful construction company. In addition, she knew that her husband was earning only $300 a month when they separated in 1932 and that Charlotte had substantial property interests at that time.[5] Thus, she probably even suspected that the construction business which her husband was managing was acquired with funds furnished by Charlotte. Nevertheless, she stood silently by for more than 28 years and accepted, without complaint, the support payments

[5] The report which Regina acquired from the private detective which she hired in 1932 listed the property owned by Charlotte at that time.

which her husband sent to her month in and month out. Consequently, by her acquiescence and silence Regina lulled Ralph and Charlotte into the false sense of security which probably induced them to commingle their separate properties to the extent that the court found that these properties could no longer be traced.

Significantly, up to this point we have held only that Regina is estopped from claiming a community property interest in property acquired by Ralph and Charlotte during the period of their invalid marriage. We have not, however, stated that Regina is also estopped from challenging the validity of Ralph's Mexican divorce in order to acquire a California divorce in her own right. We decline to do so because we believe that there are different degrees of culpable conduct on the part of both parties in a divorce action which make it possible for the plaintiff to be estopped from claiming a community property interest in property accumulated by the defendant spouse after a separation, while still having the right to sever the marriage. In fact, we can visualize numerous situations in which the public policy of this state would be subserved by the legal severance of a hopelessly broken marriage even though the same public policy would be subverted if the aggrieved party were permitted to claim a community property interest in property acquired by the estranged marital partner during the period of a subsequent putative good faith invalid marriage. Thus, we should not be required to wear "judicial blinders" nor should we refuse to embrace expansions in legal concepts whenever necessary to accomplish substantial justice, no matter how dramatic they may appear to be.

Our main reason for adhering to this view is this: The denial of a divorce on the estoppel theory does not validate a subsequent marriage (*Spellens* v. *Spellens, supra,* 49 Cal.2d 210, 220). On the contrary, its sole object is to prevent the estopped spouse from destroying a subsequent marriage or unconscionably claiming property rights. And, it was solely in this context that our Supreme Court stated that ". . . the public policy of this state requires the preservation of the second marriage and the protection of the rights of the second spouse 'rather than a dubious attempt to resurrect the original' marriage." (*Rediker* v. *Rediker,* 35 Cal.2d 796, 808 [221 P.2d 1, 20 A.L.R.2d 1152].) However, a stranger to the invalid divorce decree who has married one of the estopped parties, in good faith, is not himself estopped from challeng-

ing the invalid marriage (*Rudnick* v. *Rudnick*, 131 Cal.App. 2d 227 [280 P.2d 96]), nor is the state estopped from prosecuting for bigamy nor the government from denying federal benefits (*Williams* v. *North Carolina*, 325 U.S. 226 [89 L.Ed. 1577, 65 S.Ct. 1092, 157 A.L.R. 1366]; *Gersten* v. *Commissioner of Int. Rev.*, 267 F.2d 195).

Manifestly, Regina did not assist her husband to procure a Mexican divorce and is not *in pari delicto* with Ralph in this respect. Moreover, she obviously knew that Ralph and Charlotte were living together as husband and wife. Thus, we may safely assume that she must have believed, or at least surmised, that her husband had secured a divorce and, having no expertise in this respect, that the divorce was valid although secured without notice.[6] Ralph told Regina in 1932, during the confrontation with Charlotte in the Sacramento hotel, that he wanted a divorce; Regina filed income tax returns in which she claimed to be divorced; Ralph's mother told Regina that she heard that Ralph had obtained a divorce; Regina knew that Ralph had adopted Charlotte's daughter Beverley; and she wrote Ralph in 1960 and asked for a copy of his divorce papers.[7] Consequently, she should not, in good conscience, be estopped from removing the shackles of a hopelessly broken marriage, not only as between herself and Ralph, but completely, legally and in the eyes of the entire world.

Moreover, although Regina is estopped from claiming a community property interest in Ralph's and Charlotte's property, she is not estopped from seeking reasonable alimony from Ralph. Ralph sent Regina $200 a month from the very beginning of their separation. In addition, with the exception of a short interval, Ralph continued to send the monthly payments until June of 1966, long after his youngest child left home, and long after his mother died. Thus, it would be

---

[6] Significantly, the trial judge did not find that Regina had no belief that Ralph had procured a divorce; he merely found that she had no ". . . substantial or convincing knowledge of defendant Ralph Waldo Brown's fraudulent attempt to procure a Mexican divorce. . . ."

[7] In 1960 Regina wrote Ralph the following letter:

"Dear Ralph,

For business reasons, I need your divorce papers. Please send them to me at once. This is urgent.

We all feel very sad about Beverley. Please tell her mother that for me. It is a terrible thing to lose an only daughter and words are pretty inadequate when one is grief stricken. However, she has my sincere sympathy.

I will appreciate your sending the papers to me, and will return them to you as soon as I have completed my business with them."

inconsistent to hold that Regina is not entitled to continuation of support from Ralph, since she relied upon such regular monthly support for many years prior to its abrupt termination in 1966. In short, she has not waived her rights in relation to reasonable support from Ralph.

Appellants' secondary contention that there was "an unreasonable lapse of time" between Regina's separation and the filing of her divorce complaint, is without substantial merit. As we have stated, we can reasonably assume from the evidence that Regina believed, or at least surmised, that Ralph had acquired a divorce, and that she also believed the divorce was valid. It is therefore logical to conclude that when Regina discovered that the divorce was invalid and that she was still married to a man who was living with another woman, it reopened old wounds and caused her mental anguish, as she claimed at the trial. And, since she filed her action within one year thereafter, she was not guilty of an "unreasonable delay" as a matter of law.

In any event, there is ample evidence to support the court's judgment on the ground of wilful desertion. ■■ Wilful desertion is a "continuing offense" upon which the statute of limitations never operates as long as the desertion continues (*Price* v. *Price*, 114 Cal.App.2d 176 [249 P.2d 841]; *Van Ness* v. *Van Ness*, 32 Cal.App.2d 66 [89 P.2d 166]; *Dee* v. *Dee*, 87 Cal.App. 17 [261 P. 501]). ■■ It is the rule that if a judgment is right on any applicable theory, it must be sustained on appeal (*Sears* v. *Rule*, 27 Cal.2d 131 [163 P.2d 443]; *Kuhn* v. *Ferry & Hensler*, 91 Cal.App.2d 805 [206 P.2d 1]). ■■ And, since we have disposed of the property issue on the ground of estoppel, we see no reason why the court's judgment granting the divorce should not be upheld on the desertion theory.

In view of our decision that Regina is estopped from claiming a community property interest in the property accumulated by Ralph and Charlotte during the period of their invalid marriage, we do not reach the question as to whether the trial court had the power to declare the Ralph-Charlotte limited partnership dissolved or the other issues relating thereto. Thus, appellants' only remaining contention, which must be disposed of in this appeal, is that the court fixed excessive fees and costs for respondent's attorney.

■■ It is evident from the record that respondent's counsel, an experienced and capable lawyer, expended considerable time and effort in the preparation and presentation of

respondent's divorce case both at the trial level and in this appeal. In fact, the trial record alone supports respondent's assertion that the litigation "involved many intricate and difficult questions, particularly with regard to the amount and character of the property." Thus, if we were going to affirm the judgment in its entirety, we would be more reluctant to interfere with the trial judge's discretion, because in fixing the fee he was entitled to exercise his discretion and to draw on his own knowledge and experience after taking into consideration such factors as the nature of the litigation, its difficulty, the time consumed, the skill required, the skill employed, the attorney's standing in the profession and the success or failure of the attorney's efforts (*Elconin* v. *Yalen*, 208 Cal. 546 [282 P. 791]; *Berry* v. *Chaplin*, 74 Cal.App.2d 669 [169 P.2d 453]; 6 Cal.Jur.2d, Attorneys, § 101, pp. 169-172). However, the success or failure of an attorney's efforts is often the major factor which is considered in the fixing of attorney fees (*Smith* v. *Smith*, 115 Cal.App.2d 92 [251 P.2d 720]). Consequently, since we have no way of knowing to what extent this important factor may have influenced the court below, we deem it essential that he reconsider this issue in light of our decision. Moreover, in doing so the court should also take into consideration the services rendered and the costs incurred by respondent's attorney in presenting respondent's viewpoint in this appeal. As our Supreme Court observed in *Arenson* v. *National Auto. & Cas. Ins. Co.*, 48 Cal.2d 528, 540 [310 P.2d 961]: "Although it has been said that this court possesses the power and ability to appraise and adjudicate the value of an attorney's services (*Kirk* v. *Culley* (1927), 202 Cal. 501, 510 [261 P. 994]), we deem it better practice, particularly where it appears as it does here that there was some misapprehension in the trial court as to the nature of the issue to be resolved, that the new determination be made in the trial court."

For the reasons we have set forth herein, that part of the judgment granting respondent, Regina Brown, an interlocutory decree of divorce on the ground of extreme cruelty is affirmed. In all other respects, the judgment is reversed and the cause is remanded to the trial court with directions to enter judgment on the property issue in accordance with the views expressed herein, and on the basis of evidence previously presented and such additional evidence as may be presented by the parties, to (1) redetermine the alimony issue in accordance with appellant Ralph Waldo Brown's financial position and respondent's needs as affected by this decision,

and (2) redetermine respondent's attorney fees and costs, including any allowance for reasonable compensation and costs for representing respondent in this appeal.

Conley, P. J., and Stone, J., concurred.

A petition for a rehearing was denied July 18, 1969, and the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied August 13, 1969. Peters, J., was of the opinion that the petition should be granted.