Gloria MONEY, Petitioner,

v.

OFFICE OF PERSONNEL MANAGEMENT, Respondent,

and

Betty J. Money, Intervenor.

Appeal No. 86–1395.

United States Court of Appeals, Federal Circuit.

Feb. 11, 1987.

See also, Fed.Cir., 816 F.2d 665.

B. James Brierton, Brierton & Wingfield, of San Diego, Cal., argued for petitioner.

Angela M. Belgrove, Commercial Litigation Branch, Dept. of Justice, of Washington, D.C., argued for respondent. With her on the brief were Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director and Robert A. Reutershan, Asst. Director.

Also on the brief were Hugh Hewitt, General Counsel, Thomas F. Moyer, Asst. Gen. Counsel and Gail L. Goldberg, Deputy Asst. Gen. Counsel, Office of General Counsel, Office of Personnel Management, of counsel.

Win Heiskala, of El Cajon, Cal., argued for intervenor.

Before MARKEY, Chief Judge, FRIEDMAN, Circuit Judge, and BALDWIN, Senior Circuit Judge.

MARKEY, Chief Judge.

Petition for review of a decision of the Merit Systems Protection Board (MSPB or board) reversing the Office of Personnel Management's (OPM's) reconsideration decision awarding a survivor annuity to Gloria Money (Gloria), and ordering OPM to award that annuity to Betty Money (Betty). We affirm.

## BACKGROUND

Hubert Money (Hubert) was a federal employee from 1958 until his death in 1983. Upon his death, his widow became entitled to a civil service survivor annuity. 5 U.S.C. § 8341(d). Betty Money and Gloria Money claim that annuity.

Betty married Hubert in 1951. They settled in San Diego County, California, and had three children. They began to live apart in 1971, although Hubert continued to visit Betty and their children overnight. Betty initiated a divorce action in 1975 in San Diego County. The divorce was not pursued and never became final, however.

Gloria married Hubert in Reno, Nevada in 1975. Prior to their marriage, he had told her that he had been divorced from Betty. Gloria and Hubert jointly purchased a house in San Diego County and lived there until Hubert's death. Betty knew of the purchase and the living arrangement. While he lived with Gloria, Hubert also maintained relations with several other women.

Hubert became ill in late 1982. On June 21, 1983, Betty and Hubert entered into an

"Agreement Re Marital Rights" in which Hubert assigned the survivor annuity here at issue to Betty in return for her waiver of any rights to his other property. The parties agree that Hubert's assignment has no legal effect.

Hubert died on June 27, 1983. On June 29, 1983, Gloria applied to OPM for the survivor annuity to which Hubert's widow was entitled. Nine days later, Betty also applied to OPM for the same survivor annuity. On January 13, 1984, because Betty had never been "legally divorced" from Hubert, OPM denied Gloria's application and approved Betty's. Gloria filed a request for reconsideration. Fourteen months later, OPM not having acted on that request, Gloria appealed to the MSPB. The board took jurisdiction, finding that OPM's delay was unreasonable and that Gloria had received the equivalent of a final decision.

On June 21, 1985, OPM issued its reconsideration decision. Reversing its initial determination, OPM found that Betty was estopped from contesting the validity of Gloria's marriage to Hubert, and awarded the survivor annuity to Gloria. Betty appealed to the MSPB. After consolidating the appeals, the presiding official conducted a hearing in September 1985.

On November 7, 1985, the presiding official issued a decision reversing OPM's reconsideration decision and ordered OPM to award the survivor annuity to Betty. The presiding official found that, under California law, Betty was the legal surviving spouse of Hubert, and that she was not estopped from contesting the validity of Gloria's marriage. Gloria appealed to this court after the full board denied review.

## ISSUES

(1) Whether the board incorrectly applied federal and state law in determining that Betty Money was entitled to the survivor annuity?

(2) Whether the board erred in finding that Betty was not estopped from contesting the validity of Gloria's marriage?

## OPINION

### A. *Scope of Federal and State Law*

In 1948 Congress created a survivor annuity for widows of federal employees. Civil Service Retirement Act (CSRA) Amendments of 1948, Pub.L. No. 80–426, § 11, 62 Stat. 48, 54–55 (codified as amended at 5 U.S.C. § 8341(d)):

> If an employee or Member dies after completing at least 18 months of civilian service, his widow or widower is entitled to an annuity ... The annuity of the widow or widower commences on the day after the employee or Member dies.

"Widow" is defined in 5 U.S.C. § 8341(a)(1), as amended:

> "[W]idow" means the surviving wife of an employee or Member who—
>
> (A) was married to him for at least 9 months immediately before his death; or
>
> (B) is the mother of issue by that marriage.

The regulation in effect at the time of Hubert's death provided that civil service survivor annuity benefits were payable to "only one natural person." \* 5 C.F.R. § 831.601(b) (1983). Because the CSRA does not define "wife" or "marriage", OPM has since 1979 used a uniform definition of "marriage" to decide between competing claimants. 50 Fed.Reg. 20,064 (1985); *see Jacobs v. Office of Personnel Management,* 11 MSPB 306, 307 & n. 2, 13 M.S. P.R. 23, 25–26 & n. 2 (1982), *aff'd mem.,* 707 F.2d 513 (5th Cir.1983). In 1985 that definition was codified at 5 C.F.R. § 831.-603:

> "Marriage" means a marriage recognized in law or equity under the whole law of the jurisdiction with the most significant interest in the marital status of the employee, Member, or retiree unless the law of that jurisdiction is contrary to

\* Civil service survivor annuities commencing after May 7, 1985 may, under certain circumstances, be divided between two persons. Civil Service Retirement Spouse Equity Act of 1984, §§ 2(3)(B), 2(4)(G), 5 U.S.C. §§ 8339(k)(1), 8341(h); 5 C.F.R. § 831.614(b) (1986).

the public policy of the United States. If a jurisdiction would recognize more than one marriage in law or equity, the Office of Personnel Management (OPM) will recognize only one marriage, but will defer to the local courts to determine which marriage should be recognized.

The parties do not dispute that OPM's 1985 regulation applies to this case. *See United States v. Morton,* 467 U.S. 822, 835 n. 21, 104 S.Ct. 2769, 2777 n. 21, 81 L.Ed.2d 680 (1984) (where substantive law had not changed, regulation was given controlling weight although promulgated after suit brought).

The parties further do not dispute that California is the jurisdiction with the most significant interest in Hubert's marital status. Gloria argues, however, that OPM and the board deferred to the wrong California law in determining who was entitled to the survivor annuity. Gloria argues that, under 5 C.F.R. § 831.603, "the whole law of the jurisdiction" of California includes its community property laws. Gloria says she is entitled to the survivor annuity because the California courts would view it as a property asset of Gloria's marriage. In Gloria's view, federal law merely creates the property asset, while state law determines how it is distributed.

The board assigned federal law a bigger role. In its analysis, federal law creates the property asset and determines how it is distributed. State law merely defines the relevant familial relationships. The board said Betty was entitled to the survivor annuity because the California courts would view hers as the valid marriage. OPM and Betty argue that the board was correct. We agree.

The CSRA specifies that a federal employee's "widow" is entitled to a civil service survivor annuity. 5 U.S.C. § 8341(d). Congress directed that the "widow" receiving the annuity be the surviving wife who was "married" to the employee when he died. 5 U.S.C. § 8341(a)(1). Under that statutory scheme, the only remaining question is who was "married" to him.

One of our predecessor courts addressed that question: "In enacting [5 U.S.C. § 8341], Congress undoubtedly left the determination of whether an employee was married or not up to the laws of the individual states." *Yarbrough v. United States,* 341 F.2d 621, 623, 169 Ct.Cl. 589 (1965). In *Yarbrough,* a second wife and the children of a first wife filed competing claims to a civil service survivor annuity. The Court of Claims applied Alabama law to find that the second wife "was the lawful 'widow' of the decedent within the meaning and intent of [5 U.S.C. § 8341(a)(1) ] and [was] entitled to receive the annuity provided for in [5 U.S.C. § 8341(d) ]." 341 F.2d at 626. The Court of Claims consulted Alabama laws defining familial relationships, but did not consult its laws governing property rights.

Congress authorized OPM to administer the CSRA and to promulgate implementing regulations. 5 U.S.C. § 8347(a). The long-standing interpretation placed on a statute by the agency charged with its administration should be followed unless there are compelling indications that it is wrong. *E.g., Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801–02, 23 L.Ed.2d 371 (1969); *American Lamb Co. v. United States,* 785 F.2d 994, 1001 (Fed.Cir.1986). OPM's implementing regulation is consistent with the Court of Claims' interpretation of the CSRA. OPM "defer[s] to the local courts to determine which *marriage* should be recognized." 5 C.F.R. § 831.603 (emphasis added). Since at least 1966, OPM and its predecessor, the U.S. Civil Service Commission, have used state law only to identify which surviving spouse was *married* to a decedent at the time of his death, not to determine property entitlements. *Jacobs,* 11 MSPB at 307 & n. 2, 13 M.S.P.R. at 25–26 & n. 2; *see Nivert v. Office of Personnel Management,* 10 MSPB 65, 66, 11 M.S.P.R. 77, 79 (1982).

The CSRA contains internal evidence supporting the Court of Claims' and OPM's

interpretation. Retirees are given the right to choose either a full retirement annuity without survivor benefits, or a reduced annuity with survivor benefits, under the CSRA. 5 U.S.C. § 8339(j). This court held in *Roebling v. Office of Personnel Management,* 788 F.2d 1544, 1547 (Fed.Cir.1986), that California community property laws cannot defeat that right. The CSRA contains an anti-assignment provision. 5 U.S.C. § 8346(a). The Supreme Court found that such a provision in the Railroad Retirement Act was evidence that Congress intended annuities under that Act to be beyond the reach of California community property laws. *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979). The CSRA allows retirees to designate a survivor annuity recipient. 5 U.S.C. § 8339(k). The Supreme Court found that a beneficiary designation provision in the National Service Life Insurance Act was evidence that Congress intended benefits under that Act to be beyond the reach of California community property laws. *Wissner v. Wissner,* 338 U.S. 655, 70 S.Ct. 398, 94 L.Ed. 424 (1950). Moreover, Congress recently amended the CSRA specifically to allow OPM to recognize certain state court orders defining property rights in survivor benefits. Civil Service Retirement Spouse Equity Act of 1984, § (2)(4)(G), 5 U.S.C. § 8341(h).

▪ The language of the CSRA, at least 20 years of administrative interpretation, and judicial construction of the CSRA and similar statutory schemes support the board's finding that federal law determines to whom the civil service survivor annuity here at issue is to be paid. To the extent that California community property laws conflict with the federal statutory scheme, they must yield to it under the Supremacy Clause of the U.S. Constitution, art. VI, cl. 2. The board did not err, therefore, in ruling that Gloria's status under California community property laws was "not relevant". It correctly deferred to California laws defining familial relationships to determine who was "married" to Hubert at the time of his death.

## B. *Estoppel*

Gloria does not argue that the board incorrectly applied the California law to which it did defer. Under California law, a later marriage is presumed to be valid. *Estate of Smith,* 9 Cal.3d 74, 106 Cal.Rptr. 774, 507 P.2d 78 (1973). One challenging its validity may rebut that presumption, however, by proving that no divorce occurred in the earlier marriage. *Vargas v. Superior Court,* 9 Cal.App.3d 470, 88 Cal. Rptr. 281 (1970), *Estate of Goldberg,* 203 Cal.App.2d 402, 21 Cal.Rptr. 626 (1962). Gloria does not dispute the board's conclusion that Betty successfully rebutted the presumption and proved that hers was the valid marriage under California law.

Gloria does argue, however, that the board incorrectly refused to apply the doctrine of laches in finding Betty to be entitled to the survivor annuity. Gloria says that Betty waited too long to assert her rights as legal spouse and should be estopped from contesting the validity of Gloria's marriage.

In *Jacobs v. Office of Personnel Management,* 11 MSPB 306, 13 M.S.P.R. 23 (1982), *aff'd mem.,* 707 F.2d 513 (5th Cir.1983), a legal spouse knew about her husband's second marriage for 17 years but never told him or his second wife that their divorce had never become final. The board found that the legal spouse had unreasonably delayed taking action to protect her rights and was estopped under California law from contesting the validity of the second marriage. 11 MSPB at 308–09, 13 M.S.P.R. at 26–28. In *Brown v. Brown,* 274 Cal.App.2d 178, 82 Cal.Rptr. 238 (1969), a California court estopped a legal spouse from claiming community property assets in a second marriage that she had known about for almost 28 years.

In this case, the board credited Betty's testimony that she learned of Hubert's marriage to Gloria only six months before he died. Betty testified that Hubert sometimes spent the night with her while he was living with Gloria, and she knew he was seeing several women in addition to Gloria.

One of those women testified at the hearing. The board said that, although Betty knew from 1976 that Gloria and Hubert were living in a house they had purchased, Hubert's multiple relationships gave Betty no reason to suspect that he had remarried.

Gloria has not shown that Betty's testimony was "inherently improbable or discredited by undisputed evidence or physical fact," *Hagmeyer v. Department of the Treasury*, 757 F.2d 1281, 1284 (Fed.Cir. 1985). Accordingly, we have no reason to overturn the credibility determinations of the presiding official, who heard the witnesses at the hearing and saw their demeanor. *Griessenauer v. Department of Energy*, 754 F.2d 361, 364 (Fed.Cir.1985); *see also Hambsch v. Department of the Treasury*, 796 F.2d 430, 436 (Fed.Cir.1986).

Gloria further argues that even if Betty did not know until six months before Hubert died that he had remarried, Betty delayed unreasonably in not attempting to protect her marital rights until four days before Hubert's death, when she entered into an "Agreement Re Marital Rights" with him. Assuming that Betty had some obligation to act at all, Gloria has cited no case holding that six months is an unreasonable delay. In *Brown*, the legal spouse waited one year after discovering that her divorce was invalid before initiating action to dissolve the marriage legally. The court found one year not an "unreasonable delay" and that she was not estopped from asserting the invalidity of the earlier divorce. In *Conti v. Board of Civil Service Commissioners*, 1 Cal.3d 351, 357 n. 3, 82 Cal.Rptr. 337, 340 n. 3, 461 P.2d 617, 620 n. 3 (1969), the court noted that eight months was the shortest delay California courts had found to be unreasonable in suits for job reinstatement.

■ Because substantial evidence supports the board's finding that Betty did not know about Hubert's marriage to Gloria until six months before he died, and because Gloria has not shown that California courts would consider six months to be an unreasonable delay, we must uphold the board's refusal to apply the doctrine of laches. The board properly allowed Betty to present evidence showing that Gloria's marriage was invalid.

## CONCLUSION

The board did not err in finding that federal law directs the distribution of the present civil service survivor annuity, and in consulting California law only to identify who was Hubert's legal spouse at the time of his death.

The board correctly found that Betty was not estopped from contesting the validity of Gloria's marriage and that California courts would recognize Betty's as the valid marriage. Betty thus satisfies the definition of "widow" under 5 U.S.C. § 8341(a)(1). Because OPM will recognize only one marriage, under 5 C.F.R. § 831.-603 Gloria was not for present purposes "married" to Hubert and does not satisfy the definition of "widow" under 5 U.S.C. § 8341(a)(1). Accordingly, the board correctly determined that Betty, not Gloria, is the "widow" entitled to a survivor annuity under 5 U.S.C. § 8341(d).

AFFIRMED.