WALTER HENRY FOX *v.* DOROTHY FOX

5-4961                                                       444 S. W. 2d 865

Opinion delivered September 22, 1969

[Rehearing denied October 20, 1969]

*Butler & Hickey,* for appellant.

*Harold Sharp,* for appellee.

J. FRED JONES, Justice. Walter and Dorothy Fox were married in Arkansas in 1934, and on May 14, 1945,

while living in Memphis, Tennessee, Dorothy obtained an uncontested divorce from Walter. The custody of the couple's seven year old daughter was awarded to Dorothy and she was awarded the household furniture in lieu of alimony. About two months following the divorce Dorothy and Walter effected a reconciliation and resumed their marital relations in Memphis without the benefit of matrimony. In August 1945, they moved to Forrest City, Arkansas, where they both were employed by the Kroger Company and they purchased a home in Forrest City, taking title as husband and wife. They continued to live in Forrest City as husband and wife until in July 1967, when Dorothy again filed suit for divorce and for a determination and award of property rights; for alimony, attorney's fees and court costs. In addition to her grounds for divorce, Dorothy's petition alleged that Walter had induced her to resume the marital relations following their Tennessee Divorce by falsely repesenting to her that he had the divorce decree set aside soon after it was rendered.

In answer to the petition, Walter admitted the Tennessee divorce but denied that it had ever been set aside and he denied that he ever told Dorothy that it had been set aside. He admitted the purchase of real property, taking title in both their names as husband and wife but contends that a tenancy in common was intended rather than an estate by the entirety. By counterclaim Walter alleged that Dorothy had taken checks and money belonging to him, including an old coin collection, of a total value of $4,169. He prayed judgment for a return of the checks and money, or in the alternative, for a judgment in the amount of their value to be offset against Dorothy's one-half undivided interest in the real property.

The chancellor dismissed Dorothy's petition for a divorce and alimony for the reason that they were not married and for the reason that Walter was under no legal obligation to support her. The chancellor found,

however, that Walter had lulled Dorothy into a sense of false security and induced her to resume their marital relations under the belief that they were still legally married. Apparently on the theory of implied contract, the chancellor awarded Dorothy a judgment for $3,900 for services she rendered to Walter during the last five years they lived together. The chancellor also awarded Dorothy an attorney's fee of $250 to be paid by Walter.

Walter has appealed from the chancellor's decree and designates the following points for reversal:

"Lower court erred in ordering Walter Fox to pay Dorothy Fox's attorney an attorney fee.

Chancellor's awarding of certain personal property to appellee, Dorothy Fox, was not warranted under the law, or supported by competent evidence.

Chancellor erred in awarding $3,900.00 to appellee for services.

Lower court erred in failing to give appellant judgment against appellee for the value of the old money taken from their safe deposit box."

An itemized discussion of the points relied on and further discussion of the chancellor's decree would only add volume without weight to the decision we reach in considering this case on trial de novo.

The chancellor's finding that Walter misled Dorothy into believing that their divorce had been set aside and that they were still married when they started living together again within two months following Dorothy's appearance in the Tennessee court where her petition for divorce was granted, is not against the preponderance of the evidence. Walter was out of the state when Dorothy's petition was heard, but he returned to the state immediately following the divorce hearing and he and Dorothy resumed marital relations without any-

one knowing of the divorce except the parties to it and Dorothy's two sisters who attended the hearing. Dorothy's father testified that he never did know about the divorce. Dorothy and each of her two sisters testified that immediately upon Walter's return to the state, soon after the divorce, he advised each of them separately and also advised them collectively that he had had the divorce "thrown out"; that Dorothy believed him and that upon this representation, and at Walter's request, Dorothy returned with their seven year old daughter to live with Walter.

Walter denies that he told Dorothy, or anyone else, that he had the divorce set aside. He testified that at Dorothy's suggestion and request, they resumed their marital relationship because of their child and that he agreed to take Dorothy back on a "trial basis." He testified that their relations continued on a "trial basis" for twenty-two years from within two months following the divorce until Dorothy filed her petition in the case at bar. Walter even denies that he ever held Dorothy out as his wife during all this time they lived together. He admits that he carried her as a dependent wife on their joint income tax returns for the purpose of refunds represented by the checks involved in this case. Walter took Dorothy to Shrine conventions as his wife but denies that he ever considered, or held her out, as such. He admits that he may have introduced her on a few occasions, for his convenience, as "Mrs. Fox." Walter admitted that Dorothy worked when they first resumed the marriage relationship, but does not remember whether her income was reported as a wife's income on their joint income tax returns.

Dorothy's testimony indicates that she thought her divorce decree was an interlocutory decree and not final on the date entered.

"Q. After you obtained this divorce, you never took any steps yourself to have the decree set aside?

A. No, I didn't.

Q. Well, now, Mrs. Fox, don't you think if you got the divorce that you'd have to take some steps to get it set aside?

A. I never thought anything about it. I didn't know anything about the law. I don't know how it works.

Q. I mean logically, doesn't it seem like to you that a person can't just say, 'I'm going to go have this set aside,' without the other party to the suit doing something about it too?

A. Well, I thought there was a time limit that you could be separated and you could go and have it thrown out.

Q. But you never did anything about it yourself?

A. Well, he told me that he did.

\* \* \*

Q. Now, on what basis did you and Walter Fox go back together after this divorce? What was the basis—

A. As man and wife. He was supposed to have had that thrown out. Why should I doubt him? We come over here and we both went to work. We lived here as man and wife, and I thought we were man and wife.

\* \* \*

Q. Have you and he ever agreed to be remarried since 1945 when you got this divorce?

A. No, I told you I thought it was all settled. I thought he had that thrown out.

Q. You and Walter Fox have not had any children since this divorce in 1945, have you?

A. I had a miscarriage.

Q. When was that?

A. In '46, I believe. I had two miscarriages."

The record contains no evidence of conduct on Dorothy's part inconsistent with her belief that she and Walter were legally married, and there is no evidence of Dorothy's behavior inconsistent with that of a dutiful wife during all the years following the divorce. Walter admits that he knew they were not legally married, and he goes to considerable length in proving that he considered himself unbound to Dorothy by any legal bonds of matrimony.

"Q. Did you ever take any female other than Dorothy to any of these Shrine meetings or Grotto meetings?

A. Well, I don't know. That's my personal business. I don't think I have to answer that.

Q. Well, I don't know. The Judge may tell you you have to.

THE COURT: Yes, I think you have to answer that.

A. Did I ever take any other women? Yes, sir, I have.

Q. Who did you take?

A. Oh, well, different ones; I don't remember.

Q. Well, try to remember which ones you took somebody else to.

A. Well, I don't remember. I don't remember exactly what their names were.

Q. Well, what convention was it that you took some one else to?

A. One at Jackson, Mississippi, I taken one.

Q. Would that be the woman you're living with now in Mississippi?

A. No.

Q. Another woman?

A. Yeah.

\* \* \*

Q. Mr. Fox, was Mrs. Fox content to live with you from 1945 up until just prior to this suit was filed?

A. Had she lived with me?

Q. I mean, was she content living with you and happy living with you?

A. Up until June. See, I was going with a woman down in Jonesboro, and she come in there, and that's been in 1955 and her [and] Carolyn both never said anything about it.

Q. Well, the first trouble you had was when she went down there and caught you down there in Jackson with this other woman?

A. And scratched up my arm and everything there, and that was the first time.

Q. And up until then she was happy living with you just like things were?

A. Seemed to be. I never had any complaints.''

Walter denied that he was cohabiting with another woman part time in Jackson, Mississippi, but on deposition he testified:

''Q. Your home has been in Arkansas since '45?

A. All time; hasn't changed since then.

\* \* \*

Q. Where is your home now? Is it here?

A. Yes.

Q. Do you maintain any other residence?

A. I pay taxes and insurance, but worked every day.

Q. Do you maintain a residence at any other place?

A. I had my mail changed to Russum Hotel in Jackson.

Q. Do you live at that same hotel?

A. Yes.

Q. Do you live with another woman there now?

A. I have been for three years.

Q. Who is that woman?

A. Eula Leach.

Q. What is her address?

A. 512 Hilda, Jackson.

> Q. Are you married to her?
>
> A. No, not unless a common-law marriage down there."

Walter had collected from his employer expense items, including reimbursement for telephone calls to his wife. As to these items, he testified as follows:

> "Q. Mr. Fox, I hand you plaintiff's Exhibit No. 9, which are several expense sheets you prepared?
>
> A. I wrote them.
>
> Q. Are these expense sheets always true?
>
> A. No, I think they commonly call them 'swindle sheets.'
>
> Q. Do you pad these sheets?
>
> A. I think every salesman does. I think they do just like they do on their income tax. If they can get by with it, why it makes the biggest crooks out of anybody, the expense account or income tax.
>
> Q. Well, is that the reason Dorothy Fox's name appears on that?
>
> A. I took that—yes, as my expense.
>
> Q. You were just getting a little something out of your company?
>
> A. Well, they expect it."

Under the testimony of the parties in this case, the chancellor was justified in giving more credence to Doro-

thy's testimony than he did to Walter's, and under Dorothy's testimony and that of her two sisters, Walter led Dorothy to believe that the divorce had been set aside and that their legal marriage was still valid when they resumed the marital relationship in July or August, 1945.

Our statutory law does not provide a solution for the problem presented by the facts in this case, but a statutory solution is not necessary. A public and social interest is involved in such cases as this and pure equitable principles will prevent Walter from obtaining all the advantages of a legal marital relation, which to him was illicit and to Dorothy was legal, and at the same time avoid all the responsibility and obligations incidental to a legal marriage while enjoying, and even abusing, the rights and privileges of a single and unmarried man.

We conclude that under the evidence in this case, Dorothy should have, as near as equity can legally decree, such rights as she would have been entitled to had her thirty-three years of normal marital relations not been interrupted by the divorce which Walter convinced her had been set aside within two months of its rendition.

Equity is not partial to Arkansas in such cases as this. In the California case of *Lazzarevich* v. *Lazzarevich*, (1948) 88 Cal. App. 2d 708, 200 P. 2d 49, on facts very similar to those in the case at bar, the putative wife sued for her services and for a refund of her contributions to the household expenses. In permitting recovery, the California Supreme Court said:

"In some jurisdictions she has an action in damages for deceit against her putative husband in those cases where by fraud or misrepresentation he had induced her to enter into the supposed marriage relation. See *Cooper* v. *Cooper*, 147 Mass. 370, 17 N. E. 892, 9 Am. St. Rep. 721; *Blossom* v. *Bar-*

*rett,* 37 N. Y. 434, 97 Am. Dec. 747; *Larson* v. *Mc-Millan,* 99 Wash. 626, 170 P. 324; *Amsterdam* v. *Amsterdam,* Sup., 56 N. Y. S. 2d 19 . . .

\* \* \*

In some jurisdictions including California the deluded woman is permitted to recover the reasonable value of her services over and above the value of the support and maintenance furnished her by her supposed husband. *Sanguinetti* v. *Sanguinetti,* 9 Cal. 2d 95, 100, 69 P. 2d 845, 111 A. L. R. 342.''

In the case at bar the chancellor awarded Dorothy a money judgment for services she rendered while living with Walter under the mistaken impression that she was his lawful wife. Dorothy did not sue for a money judgment on implied contract or for damages because of fraud. She sued for a divorce, a determination and award of property rights, for alimony and attorney's fee.

In the California case of *Spellens* v. *Spellens,* (1957), 49 Cal. 2d 210, 317 P. 2d 613, the defendant encouraged the plaintiff to obtain a divorce from her husband Robert. Three days after an interlocutory decree was entered, the defendant convinced the plaintiff that a Mexican marriage following a California interlocutory divorce decree, would be legal and recognized as legal in any of the states. This advice was confirmed by a Mexican lawyer who performed a marriage ceremony for the plaintiff and defendant and they returned to California and lived as husband and wife. The defendant treated the plaintiff with cruelty and suggested that they separate. The plaintiff resisted the suggestion and the defendant then advised her that he had been informed that the Mexican marriage was invalid. The plaintiff brought action praying that the marriage be declared valid, that defendant be estopped to question its validity, and that she be awarded separate maintenance and an attorney's fee.

In holding that the defendant was estopped to deny the validity of the marriage and in commenting on the effects of such estoppel, the Supreme Court of California said:

"The theory is that the marriage is not made valid by reason of the estoppel but that the estopped person may not take a position that the divorce or latter marriage was invalid.

       \*     \*     \*

" 'We think it may now be stated that the *general* public policy in this jurisdiction, as judicially interpreted, no longer prevents application in annulment actions of the laches and estoppel doctrines in determining the effect to be given such divorce decrees.'

. . .It is not the marriage which is found valid as indicated by the above authorities . . . Rather it is that defendant by reason of his conduct will not be permitted to question its validity or the divorce; so far as he is concerned, he and plaintiff are husband and wife. \* \* \*

. . . It may be noted also that we are not recognizing a common law marriage which does not exist in this state for the theory is that the marriage is not validated; it is merely that defendant cannot contest it. Thus the judgment must be reversed.

It follows from the estoppel that plaintiff was entitled to attorney's fees, costs and support during trial and on appeal."

To the same effect are the Tennessee cases cited by appellee. *Smith* v. *North Memphis Savings Bank,* 115 Tenn. 12, 86 S. W. 392, and *Hale* v. *State,* 179 Tenn. 201, 164 S. W. 2d 822.

The evidence of record in the case at bar sustains Dorothy's contention that she lived with Walter as his

wife for more than twenty years under the mistaken belief, brought about by Walter's deceit, that the divorce had not become final or that the decree had been set aside and that she and Walter were still legally married during the entire period they lived together. There is no evidence in the record inconsistent with Dorothy's belief that she was legally married to Walter, and Walter has offered no proof tending to show that Dorothy did not believe they were still legally married, except her long toleration of his own philandering activities.

A legal common-law marriage cannot be entered into in Arkansas, nor can one be created by estoppel, but equity should, and we hold that it does, under the facts in this case, require that Walter be estopped to deny that the divorce decree was set aside or "thrown out" before it became final, and he is estopped to deny such rights as Dorothy would be entitled to had a divorce decree never been entered. In other words, we simply hold that as between Walter and Dorothy, Walter is estopped from setting up the prior divorce as a defense to Dorothy's petition, and that Dorothy is entitled to exactly the same property rights, alimony and attorney's fees as she would be entitled to had there never been a divorce.

The entire value of accumulated property is not of record in this case, and the record clearly indicates that the chancellor considered that he had no discretion other than to dismiss Dorothy's petition for alimony. The amount of the attorney's fee is not questioned on this appeal and the chancellor's award of that item is affirmed. This case is remanded to the chancery court for a determination of Dorothy's rights under the rule herein announced and for entry of a decree not inconsistent with this opinion.

Affirmed in part and remanded for further proceedings.