**Agnes Sasscer CLAGETT, a/k/a Agnes Sasscer King, Appellant,**

v.

**Joseph D. B. KING, Appellee.**

No. 6082.

District of Columbia Court of Appeals.

Argued March 16, 1972.

Decided July 27, 1973.

Bernard I. Nordlinger, Washington, D. C., with whom James R. Murphy, Washington, D. C., was on the brief, for appellant.

John Alexander, Washington, D. C., for appellee.

Before REILLY, Chief Judge, FICKLING, Associate Judge, and HOOD, Chief Judge, Retired.

REILLY, Chief Judge:

This is an appeal by a wife from an annulment of her second marriage in a suit

brought by the husband to void such marriage on the ground that neither he nor she was eligible to enter into such marital relationship because their purported divorces from prior spouses, still living, were invalid. The divorces in question were granted at different times by a court sitting in Juarez, Mexico.

After finding that none of the parties to either the first or the second marriage ever lived in Mexico, and that all four were domiciled in Maryland on the dates the moving parties—the litigants in this case—made their separate journeys to Juarez in 1968, the trial court held that the Mexican tribunal was without jurisdiction to enter the challenged divorce decrees. Having so found, the court in a written opinion reviewing the authorities concluded that the subsequent marriage of the parties to this appeal—a ceremony performed February 8, 1969 in the District of Columbia—was null and void and issued an order granting annulment and dismissing the wife's counterclaim for limited divorce based on allegations of cruel and abusive treatment.

The appeal from these provisions of the decree presents a question in an area of law which can best be described as murky in the District of Columbia by reason of seemingly inconsistent holdings of appellate courts.

As in so many domestic relations cases, the setting in which this litigation arose is a poignant one. Set forth in a voluminous transcript of a trial lasting several days, the salient features of this record may briefly be summarized as follows:

Until moving to Washington in the late 1960's the litigants until middle age resided in the State of Maryland. It appears that as young undergraduates—he at Princeton and she at Goucher—they had met casually in Baltimore during some holiday season in the thirties but thereafter went separate ways. Upon graduation, the young man, Dr. Joseph D. B. King, returned to Baltimore, attended medical school, and became a successful physician in that city. He was married in 1942 to Mary Clark Vickers, a marriage which produced four children.

After finishing her studies at Goucher, the then Miss Agnes Sasscer went back to Upper Marlboro, the historic shire town of Prince Georges County, where her father was a leading lawyer. In 1942 she was married to Henry Clagett, Jr., who became a partner in her father's firm after the war. There were two children of this marriage.

It was not until 20 years after their respective marriages that Dr. King and Mrs. Clagett met again. This happened in 1962, when Mrs. Clagett was visiting a married sister in Baltimore and found the doctor among the guests at a dinner party. He recalled to her a chance encounter in the elevator of a Baltimore hotel some 25 years previous and the lasting impression left by her conversation. Although she had forgotten this incident, his vivid recapture of the past—not without romantic precedent [1] —was apparently moving, for she agreed to future social gatherings at which both would be present. In the course of the next few years they became deeply attached and eventually expressed to each other dissatisfaction with their present marriages. This led to a tentative understanding that each would seek a divorce with the ultimate object of entering together into an enduring and happy marriage.

In working out the details of this plan, they decided to follow the example and advice of a friend in Baltimore who had solved his marital problems by procuring a divorce in Mexico. It was not until 1967 that any definite steps were taken. In the

---

1.  .  .  .  There was a Being whom my spirit oft
Met on its visioned wanderings, far aloft,
In the clear golden prime of my youth's dawn,

Upon the faery isles of sunny lawn

.  .  .  .

From *Epipsychidion*: Percy Bysshe Shelley (1821).

fall of that year, Mrs. Clagett left her home to rent a house in this city which she occupied with her daughter—then a day student in a nearby preparatory school. Soon thereafter she negotiated a separation agreement with her husband, providing for a property settlement, joint custody of the children, with support and maintenance for a certain period. This was signed on June 14, 1968.

Part of this arrangement contemplated her husband's executing a power of attorney under which he consented to the entering of a divorce decree in a Juarez court. Equipped with this paper, Mrs. Clagett made an overnight plane trip to Juarez later that same June, and with the assistance of Mexican counsel obtained from the court of that jurisdiction a final decree of divorce. It took Dr. King longer to work out an acceptable separation arrangement with his wife, and it was not until late 1968 that their agreement and the incidental instruments were executed. In December of that year, Dr. King made a similar mission to Juarez and accomplished the same result. Two months later (*i. e.*, February 1969), he and Mrs. Clagett obtained a wedding license and were married in a church ceremony. Over the next few months he discontinued his Maryland medical practice and in October of 1969, joined his new bride in the house leased to her in Georgetown.

Notwithstanding these elaborate preparations, the record discloses that this idyll, like the fateful idyll of the Sailing of the Swan, had an unhappy ending. Upon taking up residence together some subtle undercurrent of incompatibility manifested itself in the form of incessant quarrels, sometimes culminating in insults and blows, and on one occasion, the husband's taking up a pistol and firing a blank at his wife. By February of 1970, the relationship had become so embittered that the wife—having steadfastly refused to permit the doctor to share in the rental obligations of the lease or to enter into joint purchase of another dwelling—ordered him to leave the premises. A subsequent attempt at reconciliation on the doctor's part not only proved unsuccessful but resulted in his damaging her car slightly when both remonstrating drivers were on a collision course.[2]

The threshold issue is the validity of the Juarez divorces. It is fundamental that no court has jurisdiction to grant a decree of divorce unless at least one of the parties to the proceeding is domiciled in the state where such decree is sought. Williams v. North Carolina, 325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577 (1945); Bell v. Bell, 181 U.S. 175, 21 S.Ct. 551, 45 L.Ed. 804 (1901). One exception to the rule is that where the adverse party to the proceeding in the stranger state enters an appearance and has full opportunity to present the jurisdictional issue to its courts before the divorce is granted, the final decree, if not subject to collateral attack in the state where it is entered, is entitled to full faith and credit in any other state where its validity is assailed on jurisdictional grounds. Sherrer v. Sherrer, 334 U.S. 343, 68 S.Ct. 1087, 92 L.Ed. 1429 (1948). Under settled principles of international law the courts of this jurisdiction also accord the same respect to the decrees of courts of another nation, if entered under similar circumstances. Rosenbaum v. Rosenbaum, D.C. App., 210 A.2d 5 (1965).

The *Sherrer* principle—based upon the doctrine of *res judicata,* however, has no application here, for it is equally well settled that mere consent of a divorcing couple cannot create or confer jurisdiction upon the courts of a foreign country or even a sister state. DeParata v. DeParata, D.C. Mun.App., 179 A.2d 723, 725 (1962). Hence we agree with the trial court's finding that the Mexican court was without jurisdiction to grant divorces to these parties, as both

---

2. The challenged order of the court below contained a provision awarding the wife the sum of $42.03 for repairs to her car, finding the collision due to negligence on the part of the husband. This aspect of the case is not before us on appeal.

couples who were the subject of these decrees, were domiciled in Maryland when application was made to the Mexican court sitting in the border town of Juarez. In fact, neither of the moving parties to these divorce suits was even physically present in Mexico in 1968, the year these divorces were obtained, except for a few hours. The absent spouses, who remained at home, merely executed powers of attorney, but entered on appearances in the Juarez court.

Whether the decree of annulment should be permitted to stand presents a more difficult question despite the manifest logic of the lower court's action. Appellant contends that where a person enters into marriage with another person in reliance upon a foreign decree of divorce, the person who obtained such decree is thereafter estopped from attacking its validity collaterally even on jurisdictional grounds. If this proposition is correct, it would appear that a participating party to a foreign divorce decree may not plead its invalidity as a ground for annulment of a subsequent marriage or as a bar to a divorce action brought by a second spouse.

While the rule urged by appellant has become the law of Maryland, *semble*, Leatherbury v. Leatherbury, 233 Md. 344, 196 A.2d 883 (1964); *cf*. Day v. Day, 237 Md. 229, 205 A.2d 798 (1965), and several other states, it has been rejected in numerous other jurisdictions as providing a way for their residents to obtain quick divorces elsewhere in derogation of local public policy on marriage reflected in the divorce statutes of the domiciliary state. *See, e. g.,* Smith v. Smith, 79 Mass. 209 (1859). Nevertheless, general acceptance of this principle has the support of the American Law Institute. In its first Restatement of the Conflict of Laws in 1934, § 112 stated that "the validity of a divorce decree cannot be questioned . . . either by a spouse who has obtained such decree of divorce from a court which had no jurisdiction, or by a spouse who takes advantage of such decree by remarrying." The current revision extends this doctrine further:

A person may be precluded from questioning the validity of a divorce decree if, under the circumstances of the case, it would be inequitable to permit him to do so. (*Id*. 1971 ed., § 74)

Despite this trend, the courts of this jurisdiction have provided no clear guidelines to recognition of the estoppel principle. In Garman v. Garman, 70 App.D.C. 4, 102 F.2d 272 (1939), it was held that a husband who had procured a "mail order" Mexican divorce decree was not estopped from assailing its validity in a divorce action here in which the litigants were the same spouses This decision was followed by Anderson v. Anderson, 84 U.S.App.D.C. 231, 172 F.2d 280 (1949), where again taking the view that a Mexican mail order divorce was void, the court granted an annulment to the wife who had procured it in an undefended suit against the second husband.

This state of the authorities was thrown into confusion by Sears v. Sears, 110 U.S. App.D.C. 407, 293 F.2d 884 (1961), which also dealt with a Mexican mail order decree, but in which the equities of the particular litigation were against the moving party. Briefly summarized, this was a case where a husband desiring to marry another woman resorted to the mail order device and was subsequently married—both parties to the second marriage being aware that the Mexican decree was of dubious validity. After 15 years of marriage the husband sued for annulment, asserting that the divorce was a nullity and that consequently the second marriage was void. The wife, who was in failing health, counterclaimed for maintenance. Although observing that neither party deserved relief, being *in pari delicto,* the lower court nevertheless granted the annulment in order to clarify the marital status of the parties.

In reversing this decree, the circuit court —then the highest appellate court here— noted the financial plight of the second wife and her complete dependence upon her husband for support. The court concluded that on principles of equitable es-

toppel the husband was precluded from raising an issue which would enable him to repudiate his obligations under a marital relationship which he had instigated. The court emphasized, however, that the estoppel was a narrow one, affecting only the immediate parties to the second marriage, and did not estop the first wife from challenging the original divorce should she ever claim dower rights.

Despite the *Sears* holding, subsequent decisions in this jurisdiction have accorded little or no recognition to the estoppel principle in cases where the validity of foreign divorce decrees were drawn into issue. In the *DeParata* case a couple domiciled here were parties to an Alabama divorce. The husband flew to Birmingham and presented a local lawyer there with two papers his wife had signed, one a waiver of process, the other, a letter authorizing the lawyer to act for her. He also signed a complaint, an affidavit of residence, and returned immediately to Washington.

Upon the filing of these papers in the Alabama court the next day, a divorce decree was granted. About a week later the wife brought an action in the form of a bill to affirm marriage. The husband cited the Alabama decree as dispositive of their marital status, and the trial court denied relief, finding that the wife had consented to the divorce and voluntarily executed the requisite instruments. On appeal, this court accepted these findings but reversed on the ground that the Alabama court had no jurisdiction over persons not domiciled there.

Plainly, under the estoppel principle outlined in the Restatement, *supra,* the wife having knowingly agreed to the Alabama divorce was precluded from challenging its validity. The *DeParata* opinion, however, seems to reject this doctrine although it contains no reference to the *Sears* decision.

Moreover, in a 1968 decision of this court, Butler v. Butler, D.C.App., 239 A.2d 616, 618, the *Garman* and *Anderson* holdings were mentioned as supporting the statement that ". . . it is settled that Mexican 'mail order' divorces and Mexican 'ex parte' divorces are not recognized in this jurisdiction." The questionable foreign divorce in *Butler,* however, was not one sought to be repudiated by the party— a husband—who had obtained it. Instead, he relied upon it as a bar to a divorce action by his first wife—vainly as it turned out. Thus the *Butler* holding throws no light on the principal issue here.

In its written opinion in the case now before us on appeal, the trial court relied on the quoted *Butler* dictum as well as *DeParata* as controlling precedents for holding the Juarez decree invalid, and so viewed as entitling the husband to annulment of a subsequent marriage he had no right to enter upon while his first wife was alive. The court made no distinction between mail order divorces and divorces obtained in a state without domiciliary jurisdiction even though the moving party visits such place in person after advance notice to and consent of the absent spouse. We do not regard this as error.

Notwithstanding this aspect of the matter, our review of the authorities leads us to conclude that none of our recent decisions flatly rejects the central holding in *Sears, viz.,* that the moving party in the foreign divorce is estopped from questioning the very decree that he obtained. Indeed, the general principle of estoppel by judgment in branches of law outside the divorce field indicates that the *Sears* doctrine is merely a facet of a broader rule. It is also consistent with the weight of authority in other jurisdictions and the view adopted in the quoted excerpts from the Restatement of the Conflict of Laws.[3] Accordingly we are aware of no controlling authority nor any compelling reason of public policy which should deter us from applying the *Sears* rule to this case.

3. *See* Clark: Estoppel Against Jurisdictional Attack on Decrees of Divorce, 70 Yale L.J. 45 (1960).

The outcome of these proceedings concerns not only the immediate litigants but also their former spouses. All four at the time they either undertook or acquiesced in the Mexican divorce arrangements were intelligent and mature persons fully aware that their actions were intended to alter marital status. Equitable grounds for judicial intervention in the form of an annulment to restore the original status quo are not readily apparent.

In our opinion, Dr. King was estopped from challenging on jurisdictional grounds the decrees he and Mrs. Clagett relied upon in entering into the District of Columbia marriage in a suit to nullify the obligations incurred by that marriage. We so hold, even though we recognize that the equities so far as the second wife are concerned may be less than those deemed important by the court in *Sears*. Hence the judgment of annulment must be reversed.

In the present posture of this appeal we make no finding on the counterclaim for limited divorce and separate maintenance. It may well be that because of what appears to be the superior financial position of the wife, any order for support would be inequitable. In any event, as we are remanding the case, a decision on this issue falls within the province of the trial court.

Reversed and remanded.