CLARA KAZIN, PLAINTIFF-APPELLANT, v. MICHAEL KAZIN, DEFENDANT-RESPONDENT.

Argued February 6, 1979—Decided July 31, 1979.

Mr. *Robert Diamond* argued the cause for appellant (*Messrs. Diamond* and *Pitman,* attorneys; *Mr. Diamond* and *Mr. Steven R. Lane,* on the brief).

Mr. *Seymour Margulies* argued the cause for respondent (*Mr. Jack Jay Wind,* on the brief).

The opinion of the court was delivered by

HANDLER, J.

This case presents the question whether the plaintiff, who obtained a presumably void or voidable Mexican divorce from her first husband, should be allowed to maintain a matrimonial action against her present husband for divorce, alimony and equitable distribution or, alternatively, for separate maintenance. The circumstances reveal that defendant participated in plaintiff's decision to obtain a Mexican divorce from her former husband, and, following that divorce, defendant and plaintiff married and lived together for seven years, apparently believing themselves to be husband and wife. In *Tonti v. Chadwick,* 1

*N.J.* 531 (1949), the Court was presented with the same question under comparable circumstances and denied relief. We no longer find persuasive the reasoning of our earlier decision and decline to follow it. We rule in this case that the plaintiff is entitled to assert her matrimonial claims.

Plaintiff, Clara Kazin, was first married to Jesse Lawrence Liss on October 10, 1953. They had four children. Sometime prior to 1969, Liss left Clara and their children to live with another woman. Clara steadfastly refused to give him a divorce. In February of 1969, Clara met Michael Kazin, the defendant in this action, and shortly thereafter Michael proposed marriage. This led to Clara's obtaining a Mexican divorce from Liss on May 27, 1969. Less than one month later, on June 18, 1969, Clara and Michael married in this State and lived together until July 1976, when defendant moved out of their home.

In October 1976 plaintiff instituted an action for divorce on grounds of extreme cruelty and desertion and, by later amendment, adultery, seeking alimony and equitable distribution; in the alternative, she sought separate maintenance. Defendant filed an answer in which he denied that the parties were validly married to each other. He also counterclaimed for a judgment that the purported marriage between the parties was null and void on grounds that plaintiff's Mexican divorce was invalid and that her prior marriage was still in force. These allegations were reiterated as an affirmative defense after defendant was allowed by consent order to withdraw his counterclaim. Plaintiff was permitted by the same consent order, without the necessity of a formal reply, to continue to assert her previous defenses to the counterclaim, namely, estoppel, laches, fraud and unclean hands.

According to plaintiff, the plan to obtain a Mexican divorce originated with defendant, who arranged for a meeting of all interested parties, Clara, Liss, and himself, in the Newark law offices of his attorney. The attorney assured the parties that a

Mexican divorce was perfectly legal. The parties also discussed Liss' support obligations. Based on Michael's promise to marry her and to provide for everything, plaintiff did not request support from Liss and agreed to accept minimal support for her four sons (with no provision for their college education). Liss agreed to sign all papers which he and his attorney believed were sufficient to confer jurisdiction on the Mexican court. Defendant then made all the arrangements for plaintiff to go to Mexico, paid all her expenses, and personally accompanied her there. Liss generally corroborated plaintiff's version of the circumstances surrounding the Mexican divorce. He stated that the Mexican divorce was defendant's idea and defendant wanted plaintiff to be divorced as soon as possible and had promised that he would take care of the children. Liss was assured by his own attorney that the Mexican divorce would be valid. Kazin's version of these events is somewhat different. He insisted that he was approached by Liss with respect to the Mexican divorce and that it was Liss' attorney rather than his who made the arrangements. He further maintained that he accompanied plaintiff only as far as El Paso, Texas, rather than to Mexico. It is clear that all of the parties relied upon the validity of the Mexican divorce. Following that divorce, Clara and Michael married and lived together as husband and wife for seven years. Liss also remarried and presently has two children from this union.

On cross-motions, the parties requested the trial court to decide on the pleadings and affidavits "whether or not defendant may raise the question of the invalidity of the Mexican divorce." The trial judge concluded, on the basis of *Tonti v. Chadwick, supra,* that defendant was estopped from affirmatively asserting the invalidity of plaintiff's Mexican divorce, but that since the divorce was void, plaintiff could not prove a valid marriage and therefore was not entitled to either dissolution or support from defendant. On appeals by both parties, the Appellate Division upheld the judgment of the trial court, dismissing plaintiff's complaint. The court ruled in a reported decision, 161

*N.J.Super.* 174 (1978), that the Mexican divorce decree in this case was utterly void for want of jurisdiction and, for this reason, aside from estoppel, plaintiff could not prove a valid marriage to defendant and was not entitled to relief.

We are now enjoined to reexamine *Tonti v. Chadwick, supra.* In that case, Virginia Chadwick married Divo Tonti after having obtained an invalid Mexican mail order divorce from one Charles Chadwick. Divo later sued Virginia for an annulment, alleging that Virginia's Mexican mail order divorce was void for want of jurisdiction and, consequently, their marriage was bigamous and void. Virginia counterclaimed for separate maintenance. The Court rejected the claims of both parties. Tonti was not entitled to a judgment of nullity because he had good reason to know that defendant's decree of divorce from her first marriage was of questionable validity. Hence, "unclean hands" prevented him from challenging his wife's prior invalid divorce and receiving an annulment as affirmative relief. The Court also rejected the wife's counterclaim for affirmative relief in the form of separate maintenance. In this procedural context the Court, using somewhat different reasoning, refused to permit the wife to assert an estoppel against Tonti to challenge the invalid Mexican divorce. 1 *N.J.* at 537. It was stated that "[to] apply the principle of estoppel" so as to allow an action for separate maintenance when a marriage was void in essence would be to recognize a void marriage as a valid one. The effect would be "to place in the hands of the parties the opportunity and the means of frustrating the policy of our own statute which puts the dissolution of the marriage status beyond the control of the parties * * * ." *Id.* The anomaly of this result influenced Justice Wachenfeld to dissent in part from the Court's ruling. He agreed that Tonti should be denied an annulment, but believed that he should also be estopped from asserting the invalidity of Virginia's prior divorce and that Virginia, therefore, should be awarded separate maintenance. *Id.* at 538–539. He reasoned that "[i]f appellant [Tonti] is estopped to deny the validity of the marriage in affirmative relief, which is the

decision of the majority opinion, the estoppel should also operate equally to bar his attack upon the marriage when the wife seeks to obtain the enforcement of the obligations based upon that relationship". *Id.* at 539.

It is clear that in *Tonti v. Chadwick*, the Court was responsive to a powerful legislative mandate against the facile termination of lawful marriages. It was felt that to apply, or withhold, estoppel to grant affirmative relief in such circumstances would be inconsistent with that policy and would enable the parties effectively to frustrate the objectives of the matrimonial laws, particularly those governing the dissolution of the marriage status. *Id.* at 537. Those laws designedly made it quite difficult for a married person to obtain a divorce in this State. One seeking a divorce had to affix marital blame upon the other spouse. The statutory grounds for divorce were limited to relatively egregious forms of behavior, adultery, extreme cruelty, and willful desertion for at least two years. *N.J.S.A.* 2A:34–2, –3 (since amended, *L.* 1971, *c.* 212, §§ 2, 3; *L.* 1971, *c.* 217, § 11; *N.J.S.A.* 2A:34–2, –3). Moreover, the complainant was required to be blameless for the failure of the marriage. A legitimate claim for divorce could be defeated even by a guilty defendant if it could be established that the plaintiff engaged in marital conduct amounting to recrimination, condonation or unclean hands. *E. g., Piper v. Piper*, 116 *N.J.Eq.* 587 (E. & A. 1934); *Delaney v. Delaney*, 71 *N.J.Eq.* 246 (E. & A. 1906); *Gutzwiller v. Gutzwiller*, 8 *N.J.Super.* 254 (App.Div.), certif. den. 5 *N.J.* 351 (1950); see, *Bingenheimer v. Bingenheimer*, 2 *N.J.* 284 (1949); *cf. N.J.S.A.* 2A:34–7 (since amended, *L.* 1971, *c.* 212, § 4; *N.J.S.A.* 2A:34–7).

Our courts were generally faithful to these strict legislative commands, imposing heavy burdens upon the litigants in their quest for relief from an onerous or moribund marriage. *E. g., Steinbrugge v. Steinbrugge*, 2 *N.J.* 77 (1949); *Capozzoli v. Capozzoli*, 1 *N.J.* 540 (1949); *Pfeiffer v. Pfeiffer*, 1 *N.J.* 55

(1948). Decisions mirrored the severity of this legislative policy in dealing with foreign divorces obtained by New Jersey domiciliaries. In particular, there was little tolerance shown for Mexican divorces obtained through the mails or by nominal appearances, exemplified by the New York decision of *Caldwell v. Caldwell,* 298 *N.Y.* 146, 81 *N.E.*2d 60 (Ct.App.1948), and echoed in our own cases, *e. g., Tonti v. Chadwick, supra; Warrender v. Warrender,* 79 *N.J.Super.* 114 (App.Div.1963), aff'd 42 *N.J.* 287 (1964); *State v. Najjar,* 1 *N.J.Super.* 208 (App.Div.), aff'd 2 *N.J.* 208 (1949); see, *Untermann v. Untermann,* 19 *N.J.* 507, (1955). The Court in *Tonti v. Chadwick* took pains to note the then-controlling statute, *R.S.* 2:50–35, as amended, *L.* 1948, *c.* 320, § 23; *N.J.S.A.* 2A:34–22, (since repealed, *L.* 1971, *c.* 212, § 9), nullified a divorce decree obtained by a New Jersey inhabitant in another state or country "for a cause which occurred while the parties resided in this state, or for a cause which is not ground for divorce under the laws of this state * * * ." *Tonti v. Chadwick, supra,* 1 *N.J.* at 535–536. This legislative policy, strongly paternalistic and protective toward the marriages of New Jersey domiciliaries, influenced judicial perceptions of the role of equity in such cases involving vulnerable foreign divorces. Absent constitutional full faith and credit or comity, *e. g., Sherrer v. Sherrer,* 334 *U.S.* 343, 68 *S.Ct.* 1087, 92 *L.Ed.* 1429 (1948); *Schlemm v. Schlemm,* 31 *N.J.* 557 (1960); *Woodhouse v. Woodhouse,* 11 *N.J.* 225 (1953), some decisions tended to turn more on whether the foreign decrees were offensive to this State's public policy than on the real marital relationships, actual needs or comparative positions of the parties. *E. g., Hollingshead v. Hollingshead,* 91 *N.J.Eq.* 261 (Ch. 1920).

It would, nevertheless, be an overstatement to imply that courts even under prior laws were insensitive to equitable concerns or did not, within the constraints of the matrimonial statutes, conscientiously undertake to balance the equities as between parties. Many decisions demonstrated an appreciation

of the need for a genuine weighing of the relative interests of the contestants. *E. g., Woodhouse v. Woodhouse*, supra; *Warrender v. Warrender*, supra; *Judkins v. Judkins*, 22 *N.J.Super.* 516 (Ch.Div.1952); *Margulies v. Margulies*, 109 *N.J.Eq.* 391 (Ch.1931). However, more important than these judicial antecedents in terms of the relevance of equitable principles in resolving matrimonial controversies has been the drastic change in the State's statutes in the matrimonial field.

The Divorce Reform Act of 1971, *L.* 1971, *c.* 212; *N.J.S.A.* 2A:34–1 *et seq.*, both repealed and substantially amended prior legislation controlling marital relationships. The differences in public policy wrought by this revision are fundamental. Significantly, the previous statute negating foreign divorces based on jurisdictional and substantive grounds inconsistent with our own, in some measure relied upon by the Court in *Tonti v. Chadwick*, was repealed, *L.* 1971, *c.* 212, § 9, and no longer expresses the legislative attitude towards such matters. Grounds for divorce have been expanded and liberalized. *N.J. S.A.* 2A:34–2, –3. Fault in the demise of a marriage is not presently a crucial concern. *Painter v. Painter*, 65 *N.J.* 196, 205 (1974). Matrimonial blame is merely one circumstance to be weighed in granting alimony and support. *Gugliotta v. Gugliotta*,160 *N.J.Super.* 160 (Ch.Div.), aff'd 164 *N.J.Super.* 139 (App. Div.1978). Adultery is not considered a *per se* bar to alimony, *Lynn v. Lynn*, 165 *N.J.Super.* 328 (App.Div.), certif. den. 81 *N.J.* 52 (1979); *Nochenson v. Nochenson*, 148 *N.J.Super.* 448 (App. Div.1977); *Gugliotta v. Gugliotta, supra*; *cf. Chalmers v. Chalmers*, 65 *N.J.* 186, 194 n. 4 (1974); *Mahne v. Mahne*, 147 *N.J.Super.* 326 (App.Div.), certif. den. 75 *N.J.* 22 (1977), and support in the form of alimony is generally available in all matrimonial actions, including ' nullity. *N.J.S.A.* 2A:34–23; *Callaghan v. Leonard*, 152 *N.J.Super.* 95 (Ch.Div.1977); Divorce Law Study Commission, *Final Report to the Governor and the Legislature* 93–94 (May 11, 1970).

Equitable principles have moved to the forefront. *Painter v. Painter, supra*, 65 *N.J.* at 212; *Chalmers v. Chalmers, supra*, 65 *N.J.* at 193. In the event of dissolution of the marriage, assets of the spousal partnership are to be divided equitably. *N.J.S.A.* 2A:34–23. *Rothman v. Rothman*, 65 *N.J.* 219, 228–229 (1974); also, *Mey v. Mey*, 79 *N.J.* 121 (1979); *Gauger v. Gauger*, 73 *N.J.* 538 (1977); *Kruger v. Kruger*, 73 *N.J.* 464 (1977); *Smith v. Smith*, 72 *N.J.* 350 (1977); *Woliner v. Woliner*, 132 *N.J.Super.* 216 (App.Div.), aff'd o. b. 68 *N.J.* 324 (1975). The most important considerations in identifying and marshalling property for this purpose are the objective indicia of the true marital relationship of the parties, not simply the date of divorce or the formal filing of the divorce complaint. *DiGiacomo v. DiGiacomo*, 80 *N.J.* 155 (1979); *cf. Mey v. Mey, supra*; Comment, 31 *Rutgers L.Rev.* 76 (1978). Interspousal agreements continue to be enforceable only to the extent they are fair. *Carlsen v. Carlsen*, 72 *N.J.* 363, 370–371, 371 (1977); *Smith v. Smith, supra*, 72 *N.J.* at 359–360; *Berkowitz v. Berkowitz*, 55 *N.J.* 564, 569 (1970); *Schlemm v. Schlemm*, 31 *N.J.* 557, 581–582 (1960); *Bendler v. Bendler*, 3 *N.J.* 161, 168–169 (1949). Further, the statutory abolition of the harsh traditional defenses of recrimination, condonation and unclean hands is added evidence of the ascendence of equitable principles as an integral aspect of the State's public policy toward domestic relations. *N.J.S.A.* 2A:34–7; *Painter v. Painter, supra*, 65 *N.J.* at 204; *Chalmers v. Chalmers, supra*, 65 *N.J.* at 190.

The liberalization of the laws governing the dissolution of marriages has, expectedly, resulted in an astronomical increase in divorces. *Annual Reports, Administrative Director of the Courts* (1969 through 1978); also, "Statement of Chief Justice Richard J. Hughes", 102 *N.J.L.J.* 545, 552, (December 21, 1978). The increase in divorce litigation generally is a national as well as local phenomenon. *U.S. Dept. of Commerce, Bureau of the Census, Series P–23, No. 84, Divorce, Child Custody and Child*

*Support* (1979), commented upon, *N.Y. Times,* July 2, 1979, at A–14, col. 1. Changed attitudes toward marriage and the burgeoning divorce rate, reflecting the temper of the times, have created new interpersonal problems, which have already impacted upon the courts. "Interim Report of the Supreme Court Committee on Matrimonial Litigation," 104 *N.J.L.J.* (August 2, 1979); *U.S. Dept. of Commerce, Bureau of the Census, Series P–20, No. 338, Marital Status and Living Arrangements: March 1978* (1979); referred to, *N.Y. Times,* June 27, 1979, at A–1, col. 4; *e. g., Kozlowski v. Kozlowski,* 80 *N.J.* 378 (1979); *cf. M. T. v. J. T.,* 140 *N.J.Super.* 77 (App.Div.1976). In this legal and social milieu, courts are well counseled to give full range to equitable doctrines in dealing with matrimonial controversies.

The equitable principle of estoppel has been applied broadly and in a wide variety of matrimonial cases. It has been recognized that "in cases involving foreign divorce decrees, as in other situations, * * * the application of the principles of equitable estoppel cannot be subjected to fixed and settled rules of universal application, but rests largely on the facts and circumstances of each particular case." *Weber v. Weber,* 200 *Neb.* 659, 666, 265 *N.W.2d* 436, 441 (Sup.Ct.1978); see *Warrender v. Warrender, supra; Flammia v. Maller,* 66 *N.J.Super.* 440 (App.Div. 1961); *cf. Untermann v. Untermann, supra.* · The equitable rule precluding individuals from attacking foreign divorce decrees "[has] not [been] limited to situations of what might be termed 'true estoppel' where one party induces another to rely to his damage upon certain representations * * * ", *Restatement (Second) of Conflict of Laws* § 74, Comment b (1971), but has also encompassed situations sometimes termed "quasi-estoppel" where an individual is not permitted to "blow both hot and cold," taking a position inconsistent with prior conduct, if this would injure another, regardless of whether that person has actually relied thereon. *Brown v. Brown,* 274 *Cal.App.2d* 178, 188–189, 82 *Cal.Rptr.* 238, 244–245 (Ct.App.1969); also *Weber v.*

*Weber, supra; Smoak v. Smoak,* 269 *S.C.* 313, 237 *S.E.*2d 372 (Sup.Ct.1977).

In the overwhelming majority of cases, estoppel has been applied to thwart a spouse from attacking his or her own divorce. *E. g., Schlemm v. Schlemm, supra ; Smoak v. Smoak, supra ; Fox v. Fox,* 247 *Ark.* 188, 444 *S.W.*2d 865 (Sup.Ct.1969); *Watson v. Watson,* 39 *Cal.*2d 305, 246 *P.*2d 19 (Sup.Ct.1952); *Krause v. Krause,* 282 *N.Y.* 355, 26 *N.E.*2d 290 (Ct.App.1940); *Clagett v. King,* 308 *A.*2d 245 (D.C.App.1973); *Oakley v. Oakley,* 30 *Colo.App.* 292, 493 *P.*2d 381 (Ct.App.1971), *cert.* dismissed 179 *Colo.* 450, 514 *P.*2d 633 (Sup.Ct.1973); *Varap v.˙ Varap,* 76 *Ill.App.*2d 402, 222 *N.E.*2d 77 (Ct.App.1966); *Sears v. Sears,* 110 *U.S.App.D.C.* 407, 293 *F.*2d 884 (1961). Estoppel has also been applied, however, in situations analogous to that presented in this case, to prevent an individual from attacking his spouse's prior divorce. *E. g., Spellens v. Spellens,* 49 *Cal.*2d 210, 317 *P.*2d 613 (Sup.Ct.1957); *Dietrich v. Dietrich,* 41 *Cal.*2d 497, 261 *P.*2d 269 (Sup.Ct.1953), *cert.* den. 346 *U.S.* 938, 74 *S.Ct.* 378, 98 *L.Ed.* 426 (1954); *Schotte v. Schotte,* 203 *Cal.App.*2d 28, 21 *Cal.Rptr.* 220 (Ct.App.1962); see *Clagett v. King, supra* (where both husband and wife had prior Mexican divorces); generally, Annot., 13 *A.L.R.*3d 1419, 1452 (1967).

In a number of cases, courts have forbidden a husband from attacking the prior divorce decree of his wife, where he took an active role in helping her to procure that decree. *E. g., Spellens v. Spellens, supra; Gilb v. Gilb,* 170 *Cal.App.*2d 379, 339 *P.*2d 176 (Ct.App.1959); *Smith v. Smith,* 157 *Cal.App.*2d 46, 320 *P.*2d 100 (Ct.App.1958); *Harlan v. Harlan,* 70 *Cal.App.*2d 657, 161 *P.*2d 490 (Ct.App.1945). Estoppel has also been applied, however, where the second husband's involvement in his spouse's prior divorce was relatively passive but, in marrying her, he himself relied on that divorce. *E. g., Judkins v. Judkins, supra; Margulies v. Margulies, supra; Dietrich v. Dietrich, supra; Schotte v.*

*Schotte, supra* ; also, *Zirkalos v. Zirkalos,* 326 *Mich.* 420, 40 *N.W.* 2d 313 (Sup.Ct.1949); *Goodloe v. Hawk,* 72 *App.D.C.* 287, 113 *F.* 2d 753 (1940). The doctrine estopping a party who marries in reliance upon a prior divorce from subsequently attacking that divorce has been widely endorsed. *E. g., Schlemm v. Schlemm, supra; Woodhouse v. Woodhouse, supra; Weinberg v. Todd Shipyards,* 97 *N.J.Super.* 289 (App.Div.), certif. den. 51 *N.J.* 9 (1967); also *Chilcott v. Chilcott,* 257 *Cal.App.*2d 868, 65 *Cal.Rptr.* 263 (Ct.App.1968); *Commonwealth v. Case,* 200 *Pa.Super.* 200, 189 *A.*2d 756 (Super.Ct.1963). In cases in which several of these factors coalesce, as, for example, where the party seeking to attack the prior foreign divorce of a current spouse was not only aware of that decree but also assisted or helped in its procurement and, further, relied upon it by marrying that person, the claim for an estoppel is especially strong. *Gilb v. Gilb, supra* ; Clark, "Estoppel Against Jurisdictional Attack on Decrees of Divorce," 70 *Yale L.J.* 45, 47–49, 56–57, 66–67 (1960); see Note, 61 *Harv.L.Rev.* 326, 333–334 (1948). Akin to the doctrine of estoppel as applied where there is a second marriage is the strong presumption in favor of the validity of the latest of two or more marriages, as well as the corollary presumption that a prior marriage has been lawfully terminated by death or divorce. *Cf. Dawson v. Hatfield Wire & Cable Co.,* 59 *N.J.* 190, 193 (1971); also, *Parkinson v. J. & S. Tool Co.,* 64 *N.J.* 159 (1974). These presumptions cast a heavy burden on the person objecting to the legality of the last marriage to prove its invalidity by clear and convincing evidence. *Booker v. James Spence Iron Foundry, Inc.,* 80 *N.J.Super.* 68, 73–74 (App.Div.1963); *Minter v. Bendix Aviation Corp.,* 26 *N.J.Super.* 268, 273 (App.Div.1953), modified on other grounds, 24 *N.J.* 128 (1957).

Not all courts have been persuaded that the estoppel doctrine is an appropriate judicial tool where there has been a remarriage. Some decisions have condemned application of the doctrine to uphold an invalid foreign divorce decree as tantamount

to countenancing bigamy or conferring upon the parties the right to self-help in securing a divorce contrary to the laws of the jurisdiction. *E. g., Cross v. Cross*, 94 *Ariz.* 28, 381 *P.*2d 573 (Sup.Ct.1963); *Gardner v. Gardner*, 144 *W.Va.* 630, 110 *S.E.*2d 495 (Sup.Ct.1959). These approaches have in turn invited criticism. The State's concern over bigamous conduct need not be undermined by the estoppel doctrine invoked by private parties in civil matrimonial litigations. Clark, "Estoppel Against Jurisdictional Attack on Decrees of Divorce", *supra* at 62; *cf. State v. Najjar, supra.* Many courts have expressed the view that it would be even more unseemly and inimical to a sound public policy to permit the spouse of a second marriage to act inconsistently with prior conduct in entering into that marriage. They have stressed that a spouse who has received the benefits of a second marriage should not be able to escape its obligations. *Schotte v. Schotte, supra ; cf. Torres v. Torres*, 144 *N.J.Super.* 540 (Ch.Div.1976).[1]

---

[1] It has been observed that allowing one to attack the validity of a Mexican divorce decree in this context would have the peculiar result of rewarding "immoral" behavior twice: first, in procuring that divorce originally, and, second, in disavowing a commitment to the subsequent marriage. *Oakley v. Oakley*, 30 *Colo.App.* 292, 493 *P.*2d 381 (Ct.App.1971), *cert.* dism. 179 *Colo.* 450, 514 *P.*2d 633 (Sup.Ct.1973). "To hold otherwise protects neither the welfare nor morals of society but, on the contrary, such holding is a flagrant invitation to others to attempt to circumvent the law, cohabit in unlawful state, and when tired of such situation, apply to the courts for a release from the indicia of the marriage status." *Spellens v. Spellens*, 49 *Cal.*2d 210, 219, 317 *P.*2d 613, 618 (Sup.Ct.1957); *Harlan v. Harlan*, 70 *Cal.App.*2d 657, 663–664, 161 *P.*2d 490, 494 (Ct.App.1945). Courts permitting an estoppel approach have recognized that "[f]rom a pragmatic viewpoint, judicial invalidation of irregular foreign divorces and attendant remarriages, years after both events, is less than ineffective sanction against an institution whose charm lies in its immediate respectability * * *", *Goodloe v. Hawk*, 72 *App.D.C.* 287, 291, 113 *F.*2d 753, 757 (1940), and have concluded that "public policy" in many situations requires the "preservation of remarriages rather than a dubious attempt to resurrect the original". *Spellens v. Spellens, supra*, 49 *Cal.*2d at 220, 317 *P.*2d at 619, quoting from *Goodloe v. Hawk, supra*.

These views comport closely with our current matrimonial policies. *Cf.* Divorce Law Study Commission, *Final Report to the Governor and Legislature, supra* at 6–12. Full weight should be given the legislative objectives governing divorce, which reflect a genuine concern for the realities of the marital relationship and allow the expeditious, orderly and fair dissolution of destroyed marriages and call for the protection, financial and otherwise, of the survivors of such marriages, including children. There remains little, if any, interest in encouraging the resurrection of deceased marriages, even if pronounced dead by other tribunals whose processes are not completely consistent with our own. In this context, the estoppel doctrine itself should be a reflection of that public policy and be applied, or not, in accordance with its demands in the circumstances of the given case. Clark, "Estoppel Against Jurisdictional Attack on Decrees of Divorce," *supra* at 54–56, 68.

Although the parties here offered different versions of the events which culminated in the Mexican divorce decree, certain matters are not disputed or contested and their differences do not militate against the application of the doctrine of estoppel. Defendant was hardly an ignorant or innocent bystander. He participated in some degree in the decision to obtain the divorce and admitted accompanying plaintiff on her trip to Mexico, at least as far as the border at El Paso. The parties married a month after the divorce and undertook the normal responsibilities of marriage, including the acquisition of a marital home and other assets and the mutual care of plaintiff's children by her first husband. Their married life together lasted for seven years. Additionally, defendant presumably knew that plaintiff's former husband, also in reliance upon the Mexican divorce, remarried and had two children from this second union. Thus, several factors, knowledge, participation, acceptance of benefits and subsequent marriage, establish defendant's nexus with plaintiff's foreign divorce. It would, in our view, be contrary to the public policy reflected in our current laws to permit defend-

ant under these circumstances to attack the validity of his wife's prior Mexican divorce and to repudiate the obligations which he assumed in marrying plaintiff. To that end, he is estopped to assert these particular defenses to plaintiff's marital claims.

Accordingly, the judgment of the Appellate Division is reversed and the matter remanded for the reinstatement of plaintiff's complaint and such further proceedings as may be appropriate.

*For reversal and remand*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—7.

*For affirmance*—None.